**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| ROBERT J. McGEE, JR. an individual, II IN ONE CONTRACTORS, INC., an Illinois Corporation, II IN ONE REBAR, INC., an Illinois Corporation, and CONCRETE COLLECTIVE, a joint venture between II IN ONE CONTRACTORS, INC., W.E. O'NEIL CONSTRUCTION CO., and TRICE CONSTRUCTION COMPANY. | Case No.   1:25-cv-600 |
| Plaintiffs, | |
| v. | |
| THORNTON TOMASETTI, INC., a New York Corporation and SCOTT A. SCHNEIDER, an individual. | |
| Defendants. | |

## COMPLAINT

NOW COME Plaintiffs, Robert J. McGee, Jr., II in One Contractors, Inc., II in One Rebar, Inc., and Concrete Collective, by and through their attorneys, Kathleen O. Barnes (*pro hac vice* admission pending), John E. Sebastian and Joel B. Daniel of Watt, Tieder, Hoffar & Fitzgerald, L.L.P., and for their Complaint against Defendants, Thornton Tomasetti, Inc. and Scott A. Schneider, state as follows:

## INTRODUCTION

In a shocking and disheartening turn of events, the African American owner of a local construction company finds himself and his company on the brink of forced closure because of racial discrimination by the structural engineer of record (Thornton Tomasetti) for the construction of The Obama Presidential Center. Thornton Tomasetti was hired by The Barack Obama Foundation (the "Obama Foundation" or "Owner") to serve as its structural engineer for the

1

construction of The Obama Presidential Center located at 6001–6121 South Stony Island Avenue, in Chicago, Illinois (the "Project").

Despite the dedicated performance efforts and commitment to the Obama Foundation's stated goals for the Project by II in One and its joint venture partners, II in One was subjected to baseless criticisms and defamatory and discriminatory accusations by the Obama Foundation's structural engineer, Thornton Tomasetti. Thornton Tomasetti's defamatory and discriminatory statements came as a shock to II in One and its Owner, Robert J. McGee, Jr., who remains proud of his company's work on a Project intended to honor the legacy of the United States' first African American President. Prior to working on the Project, II in One had successfully completed many high-profile projects in the Chicagoland area, including Projects utilizing the same specification section that is central to this dispute. Moreover, Bob McGee was aware and supportive of the Obama Foundation's diversity and inclusion goals for the Project and never imagined that the Obama Foundation's structural engineer would single out a minority-owned subcontractor for unfair criticism and falsely accuse II in One of lacking sufficient qualifications and experience to perform its Work, while, in the same letter, stating that the non-minority-owned contractors were sufficiently qualified. As a direct result of the Defendants' unlawful and discriminatory actions, II in One has suffered extreme financial loss and reputational harm.

## PARTIES

1.     Plaintiff, II in One Contractors, Inc. ("II in One") is an Illinois Corporation with its principal place of business located at 4344 West 45th Street in Chicago, Illinois. It is a 40-year-old, minority-owned business in the business of providing general contracting, construction management and design-build services.

2.     Plaintiff, Robert J. McGee Jr. ("Bob McGee") is a resident of the Kenwood

2

community area in Chicago and an owner and co-founder of II in One. As an African American, Bob McGee is a member of a racial minority.

3.     Bob McGee is one of two co-owners of II in One. The other co-owner is Oliver B. Fifer ("Oliver Fifer"). Like Bob McGee, Oliver Fifer is an African American and a resident of Chicago, Illinois.

4.     II in One is one of three joint venture partners that form Concrete Collective. Concrete Collective is a joint venture among three Chicago-based construction companies: II in One Contractors, Inc. Trice Construction Company, and W.E. O'Neil Construction Co. ("Concrete Collective"). Concrete Collective's principal place of business is located at 1245 W. Washington Blvd. in Chicago, Illinois.

5.     Trice Construction Company ("Trice") is an Illinois Corporation with its principal place of business at 921 W. Van Buren Street, Suite 100 in Chicago, Illinois. Trice is a 57-year-old, minority and women-owned business in the business of providing concrete construction services.

6.     W.E. O'Neil Construction Co. ("W.E. O'Neil") is an Illinois corporation with  its principal place of business at 1245 W. Washington Blvd. in Chicago, Illinois. W.E. O'Neil is a 100%-employee-owned business founded in Chicago in 1925, which is in the business of providing  general contracting and other construction services in a wide range of market sectors.

7.     In addition to being one of the three joint venture partners forming Concrete Collective, II in One is one of two joint venture partners that form a joint venture known as II in One Contractors/Rebar JV ("II in One JV").

8.     II in One JV is a joint venture between II in One and II in One Rebar, Inc ("II in One Rebar").

9.     Like II in One, II in One Rebar is an Illinois Corporation that is jointly owned by Bob McGee and Oliver Fifer.

10.     II in One, II in One JV and II in One Rebar all have the same principal place of business, which is 4344 West 45th Street in Chicago, Illinois.

11.     Defendant Thornton Tomasetti, Inc. ("Thornton Tomasetti") is a New York corporation, which may be served through its registered agent, Illinois Corporation Service Company, whose address is 801 Adlai Stevenson Drive, Springfield, IL 62703-4261. Thornton Tomasetti is in the business of providing engineering and other professional design services.

12.     Defendant Scott A. Schneider ("Schneider") is a resident of the State of New York. He is an employee and/or officer of Thornton Tomasetti, where he has the title of Senior Principal & Structural Engineering Practice Co-Leader.

## NATURE OF THE ACTION

13.     Count I of this Complaint alleges a cause of action for discrimination in violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981"). Counts II, III and IV allege causes of action for libel, tortious interference with contract, and tortious interference with business relationships, respectively, and seek recovery of monetary damages resulting from the Defendants' false statements about the Plaintiffs.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the claims alleged in Count I arise under the laws of the United States.

15.     In addition, this Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(a)(1) in that the matter in controversy, exclusive of interest and costs, exceeds the sum or value of $75,000 and is between citizens of different States.

16.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because the events, acts, and/or omissions giving rise to Plaintiffs' claims occurred within this judicial district, and more specifically, within the City of Chicago.

<strong>FACTS COMMON TO ALL COUNTS</strong>

**A.     Summary of the Project and the Obama Foundation's Stated Goals and Commitments**

17.     Concrete Collective was and is a major, civil subcontractor for the Project. The Owner of the Project is the Obama Foundation, and Lakeside Alliance ("Lakeside") served as the Obama Foundation's Construction Manager and General Contractor for the Project .

18.     On information and belief, Lakeside is an Illinois general partnership, which is a joint venture between Turner Construction Company and four other companies: Powers & Sons Construction Company, UJAMAA Construction Inc., Brown and Momen, Inc., and Safeway Construction Company.

19.     Upon information and belief, on or around March 17, 2021, The Obama Foundation entered into an Amended and Restated Pre-Construction and Construction Agreement with Lakeside to serve as General Contractor and Construction Manager for the Project (the "General Contract").

20.     Thereafter, Lakeside entered into a Subcontract Agreement with Concrete Collective dated May 27, 2021 to provide the Project's cast-in-place concrete labor and materials (the "Concrete Collective Subcontract").

21.     On or around August 30, 2021, II in One JV entered into a written subcontract agreement with Concrete Collective to perform a portion of Concrete Collective's Work on the Project (the "II in One JV Subcontract").

22.     Specifically, pursuant to the II in One JV Subcontract, II in One JV agreed to

5

provide, and did provide, labor, materials, and equipment to the Project for rebar installation, concrete pouring, concrete forming and/or other similar and related work.

23. The initial subcontract price of the II in One JV Subcontract was $27,025,966.00.

24. Upon information and belief, the Obama Foundation also entered into a written contract with Thornton Tomassetti to serve as the Obama Foundation's Engineer of Record for the Project. As Thornton Tomasetti's Senior Principal & Structural Engineering Practice Co-Leader assigned to the Project, Scott Schneider was tasked with managing Thornton Tomasetti's work on the Project.

25. Among other things, the General Contract established and memorialized certain diversity and inclusion requirements and goals for the Project.

26. Specifically, Exhibit 4.8 of the General Contract, states in pertinent part:

> **Owner is committed to maintaining an environment in which diversity and inclusion are valued and respected in all aspects of its operations as well as the operations of its partners and third-party contractors**. Construction Manager hereby covenants that it shall at all times comply with (i) the Diversity and Inclusion Plan, and (ii) the Commitments and all other requirements set forth in this Exhibit 4.8.

> **Owner's diversity and inclusion requirements and goals are of the utmost importance. Construction Manager hereby acknowledges that its performance in implementing and executing the Diversity and Inclusion Plan is critical to Construction Manager's ability to comply with this Exhibit 4.8, including achieving the Commitments. Construction Manager also acknowledges that its general business conduct shall reflect the spirit and values of Owner's diversity and inclusion goals broadly** (emphasis added).

27. Schedule 1A to Exhibit 4.8 of the General Contract further memorializes Lakeside's commitment to delivering the Project by transparent and inclusive means, stating in pertinent part:

> **Construction Manager aims to practice a holistic approach to creating economic opportunity and sustaining economic growth by striving to address and provide solutions to barriers that have historically prevented**

6

**disadvantaged businesses from participating on projects of this magnitude, as well as creating opportunities and providing resources within the construction trades for residents of historically disadvantaged neighborhoods.** Construction Manager will supplement the expectations outlined below with transparency by way of regular community engagement and by enlisting relevant subject matter experts when necessary. All acts will be in the service of the creation of a blueprint for a robust workforce and supplier diversity program. (emphasis added).

28.     Because Concrete Collective was only provided a redacted copy of the General Contract, Concrete Collective does not have knowledge of all diversity and inclusion requirements applicable to Lakeside under the General Contract.

29.     Additionally, none of the Plaintiffs was provided with a copy of contract between the Obama Foundation and Thornton Tomasetti. However, on information and belief, the Obama Foundation required Thornton Tomasetti to provide its Project services in a manner consistent with the Obama Foundation's commitments and goals for the Project, including the diversity and inclusion goals and the requirement to create economic opportunity and growth to historically disadvantaged businesses described herein.

30.     The General Contract also requires Lakeside to provide the Obama Foundation with certain reports regarding Lakeside's efforts to comply with the diversity and inclusion goals and commitments for the Project.

31.     In January 2023, Lakeside published its "Obama Presidential Center 2022 Diversity, Equity & Inclusion Report" (the "2022 DEI Report").

32.     As of November 12, 2024, a copy of the 2022 DEI Report was available on Lakeside's website at the following link: https://www.lakesidealliance.com/2022-diversity-equity-inclusion-report.

33.     The 2022 DEI Report includes the following goals and commitments of Lakeside:

As builders of the Obama Presidential Center, Lakeside Alliance endeavors to transform the construction paradigm in Chicago through intentional engagement

7

with business and our community.

\*\*\*

We are committed to ensuring this historic project not only celebrates the legacy of our nation's first African American President, but it also benefits local residents, creates jobs, drives investment into the community and ushers in a new, more inclusive era of construction in Chicago.

34. The 2022 DEI Report also sets forth Lakeside's "Values & Commitments" with respect to the Project, which include the following:

We will expand career opportunities in both the professional field and the union trades for historically underrepresented populations. **We will achieve significant diverse workforce participation by ensuring individuals have equal access to information, training, apprenticeships, and job opportunities**—while removing the barriers that prevent individuals from reaching their full potential.

\*\*\*

We are committed to **achieving significant diverse business participation** by intentionally ensuring an inclusive and transparent procurement process, **offering equal access to significant contract opportunities, removing historical barriers, and providing support and resources to ensure their success.** (emphasis added).

35. Despite the Obama Foundation's stated goals and commitments to diversity and inclusion and ensuring equal access to contract opportunities and success on the Project, Thornton Tomasetti and Scott Schneider subjected the Plaintiffs to unjustified and discriminatory conduct, as described herein, which directly undermined the Obama Foundation's DEI goals and commitments and mission to bring transformative change to the construction industry and local community by providing solutions to barriers that have historically prevented disadvantaged businesses from participating on projects of this magnitude.

36. The statements and actions of Thornton Tomasetti and Scott Schneider not only undermined the Obama Foundation's stated goals and commitments but also violated Section 1981 of the Civil Rights Act of 1866.

37. In addition, as a result of the Defendants' defamatory and discriminatory statements and actions, Concrete Collective, II in One and Bob McGee have suffered extreme financial losses,

and II in One and Bob McGee may be forced to seek bankruptcy protection.

38.     As described in more detail below[1], in an apparent attempt to cover up their own performance failures, Thornton Tomasetti and Schneider issued a letter to the Obama Foundation indicating that Project delays and cost overruns were the result of the "underperformance and inexperience of the concrete sub-contractor," while expressly stating that the contractor and subcontractor firms that were not minority owned could have completed the work without problems. In essence, the Defendants told the Project Owner, falsely, that all of the Project delays and cost overruns were the fault of the minority-owned firms, and that "more qualified" firms (such as the firms that happen not to be owned by racial minorities) would not have required as much assistance or had as many "problems."

39.     The Defendants intended that the Obama Foundation rely on the Defendants' false, defamatory and discriminatory statements, and the Obama Foundation did, in fact, rely on the Defendants' false statements about II in One's qualifications and performance when the Obama Foundation decided to reject Concrete Collective's claim for the additional costs incurred as a result of changed conditions.[2] As a direct result of that decision, each of Concrete Collective's partner entities (II in One, Trice and W.E. O'Neil) has suffered substantial and unjust financial

---

[1] *See*, paragraphs 99–112 of this Complaint.

[2] In May 2023, after completing approximately 35% of its Work, Concrete Collective submitted a Request for Equitable Adjustment (the "REA") to Lakeside. Concrete Collective's initial request in the REA sought payment in the initial amount of $19,838,916 for then-known schedule and cost impacts incurred by Concrete Collective through no fault of its own. Lakeside passed through the REA to the Obama Foundation, but most of the costs requested in the REA were rejected by the Obama Foundation. The Foundation's rejection of the majority of the REA, which was based on the defamatory and discriminatory statements and actions of Thornton Tomasetti, resulted in Concrete Collective's partner firms having to self-fund approximately $41,000,000 of its Work. When the REA was initially submitted, the full extent of additional costs from unexpected and changed conditions was not yet known. Now that Concrete Collective's Work is nearly complete, the additional costs incurred total approximately $41,000,000. Accordingly, Concrete Collective has recorded a Mechanics Lien in the amount of $40,753,475, which represents the principal amount owed and unpaid to Concrete Collective for Work it completed on the Project as of August 31, 2024. On November 13, 2024, Concrete Collective also filed a Complaint for foreclosure of its Mechanics Lien in the Circuit Court of Cook County, which is pending as Case No. 2024 CH 10144.

harm, and by extension, so have their employees and the local communities impacted by the Project.

40. As a direct result of the Defendants' false statements (and the Obama Foundation's decision to rely thereon), Concrete Collective has suffered monetary damages in the initial amount of at least $40,753,475, exclusive of attorneys fees, interest and other compensable costs. In addition, Bob McGee, II in One and II in One Rebar have suffered reputational harm and concomitant lost income as a direct result of Thornton Tomasetti's and Schneider's defamatory and discriminatory statements and actions.

**B.      II in One's History, Experience and Professional Reputation**

41. Bob McGee began his construction career as a tradesman in Chicago and has worked in the local construction industry for more than 51 years.

42. During his 51 years in the construction industry, Bob McGee has worked as a project manager, estimator, engineer and superintendent and currently serves as Operations Manager.

43. Bob McGee holds a B.S. degree in Commerce and Accounting from DePaul University and is a member of the American Concrete Institute and the former President of Associated Steel Erectors.

44. He has also successfully managed II in One for more than forty years.

45. Over the last 40+ years, II in One built a reputation as a premier minority-owned business in the Chicagoland construction industry.

46. II in One has developed strong relationships and a reputation for excellence among its clients and industry partners; as well as relationships and a reputation that has helped II in One

operate successfully and profitably for more than forty years.

47.     Without limitation, II in One has developed a reputation for specialized expertise and excellence in the areas of carpentry, concrete placement, reinforcement steel installation and structural steel erection.

48.     In addition, II in One has a reputation for commitment to the development and training of its employees, including members of racial and ethnic minorities from communities in the South Side neighborhoods of Chicago. As a result, many members of II in One's management team have risen through the ranks from apprenticeship level to hold positions as project managers, superintendents and foremen.

49.     II in One also has a longstanding practice of engaging residents in local neighborhoods of active projects (including neighborhoods in and around the South Side of Chicago) to hire and train for current projects, and of establishing relationships leading to long-term hiring pipelines.

50.     In addition to being a co-founder and co-owner of II in One, Bob McGee currently serves as II in One's President and Project Executive.

51.     II in One used its extensive expertise and experience (as described herein) to bring critical knowledge, skills and value to the Concrete Collective joint venture team and the Project.

52.     More specifically, II in One provided Concrete Collective and the Project with both technical expertise related to concrete placement and reinforcing steel installation, as well as critical workforce participation leadership required to meet the workforce participation goals established by the Obama Foundation for the Project.

53.     Prior to participating in the Obama Presidential Center Project, II in One successfully completed numerous, high value contracts on major Chicagoland projects, including,

without limitation, the projects at the following buildings/locations: Millenium Park, Harold Washington Cultural Center, McCormick Place, Lake Shore Drive, Midway Airport, O'Hare Airport (American Airlines terminal), Wrigley Field, Metropolitan Water Reclamation District of Greater Chicago Water Reclamation Plant, Kennedy King College, the Chicago Riverwalk, the University of Chicago, Northwestern Hospital, Cook County Hospital, and projects for the Chicago Housing Authority.

54.     Upon information and belief, Lakeside and/or the Obama Foundation relied, in part, on their knowledge of II in One's experience and excellent reputation (as described herein), when they chose to award the Concrete Collective Subcontract to Concrete Collective.

55.     Despite II in One's extensive experience and crucial expertise, II in One was subjected to unwarranted critiques of its qualifications by the Defendants.

56.     On information and belief, the Defendants falsely and unfairly criticized Plaintiffs' performance and made defamatory and discriminatory statements about Plaintiffs because of II in One's status as a minority (African American) owned contractor and because of the officers/employees of II in One's status as members of a racial minority.

57.     Moreover, the Obama Foundation relied on the false, defamatory and discriminatory actions of the Defendants when it denied Concrete Collective's claim for additional compensation, as set forth in the REA.[3]

### C.     Additional Pertinent Facts Regarding Concrete Collective's Work and REA

58.     As stated, Concrete Collective timely submitted an REA requesting compensation for massive additional costs incurred by Concrete Collective as a result of the acts and omissions of Thornton Tomasetti and Scott Schneider, as described herein. Without limitation, the Plaintiffs

---

[3] *See*, footnote 2, *supra*.

suffered significant damages due to Thornton Tomasetti's improper and unanticipated decision to impose rebar spacing and tolerance requirements that differed from the American Concrete Institute (ACI) standards that formed the basis of Concrete Collective's bid for the Project, which, when coupled with Thornton Tomasetti's excessively rigorous and unnecessary inspection and Request For Information (RFI) processes, significantly impacted Concrete Collective's and II in One's actual productivity resulting in millions of dollars in losses to II in One and Concrete Collective.[4]

59.     Concrete Collective's REA was submitted in accordance with the Concrete Collective Subcontract, which permits Concrete Collective to assert a claim for actual damages, including delay damages.

60.     The original Guaranteed Maximum Price ("GMP") for Concrete Collective's Scope of Work was $92,912,937.

61.     The assumptions made by Concrete Collective in developing its bid were reasonable and its original GMP estimate was competitively bid.

62.     Unfortunately, due to unforeseen factors outside Concrete Collective's control (including actions and inactions by Thornton Tomasetti and Schneider), Concrete Collective was never given the opportunity to achieve its commercial goals and instead has financed completion of the Project with its own money—something that was never expected or intended by the contracting parties at the time of bidding.

63.     The REA consisted of a 21-page narrative, accompanied by 49 pages of exhibits, which included cost backup, detailed analyses supporting causation, and other documentation demonstrating the causal link between highly complex changed conditions and Concrete

---

[4] *See*, footnote 2, *supra*.

Collective's lost labor productivity and other damages.

64.     The REA was developed based on information available to Concrete Collective at the time of the RFP, including progress data and then-current cost projections. It included a detailed analysis of Concrete Collective's schedule and cost impacts to date, including summaries of Concrete Collective's compliance with the Concrete Collective Subcontract's notice provisions and Concrete Collective's entitlement to an extension of time and increase in the Concrete Collective Subcontract GMP due to unforeseen conditions and schedule impacts. Concrete Collective's initial request amount was $19,838,916, which included significant concessions intended to promote a timely settlement to prevent the partner firms from self-funding future losses for the remaining 65% of the Work.

65.     After the REA was submitted, the contracting parties were able to resolve smaller, discrete items included in the REA, but the single largest cost category comprising Concrete Collective's claim (lost labor productivity) and other significant impacts (*e.g.*, time-related costs) remain unresolved and have increased.

66.     In the twenty months since Concrete Collective submitted its initial REA, Concrete Collective's losses continued to increase, and Concrete Collective's joint venture partners (including II in One) were forced to pay for completion of Concrete Collective's Work.

67.     The majority of Concrete Collective's compensable costs, including lost labor productivity, were caused by a multitude of contributing factors outside its control, including but not limited to, changed conditions affecting sequencing and preventing the logical flow of work, lack of mechanical, electrical, and plumbing ("MEP") design coordination, atypical and unexpected interpretation of certain Project specifications by Thornton Tomasetti (as detailed below), extraordinary requirements for Requests for Information ("RFIs"), design errors,

14

omissions and/or inconsistencies in the Contract Documents, inspection process delays and unforeseeable limitations in available skilled labor.

68. When Concrete Collective prepared its bid for the Concrete Collective Subcontract, Concrete Collective developed its original GMP estimate in a transparent manner between November 2020 and April 2021, informed by the Contract Documents, including plans and specifications provided by Lakeside and the Obama Foundation, and the Parties' preconstruction efforts.

69. Lakeside and the Obama Foundation represented and warranted that the plans and specifications were complete and adequate, and that they accurately depicted the Work to be performed by Concrete Collective. Concrete Collective relied on those representations in preparing its bid and executing the Concrete Collective Subcontract.

70. Upon information and belief, Thornton Tomassetti and Schneider were aware, or should have been aware, of the ACI standards governing rebar spacing and tolerance requirements (including ACI 318 described below) as well as the inspection requirements and RFI process anticipated for the Concrete Collective Subcontract.

71. Concrete Collective's bid productivity and price did not, and could not, account for the aforementioned unforeseen factors outside its control, including, *inter alia*, the time and associated lost productivity resulting from Concrete Collective's necessary efforts to comply with Thornton Tomassetti's unreasonable interpretation of certain plans and specifications imposed by Thornton Tomasetti and the Obama Foundation.

**D.** **Thornton Tomasetti's Unexpected Interpretation of Project Specifications**

72. The American Concrete Institute's "ACI 318" Building Code is a standardized document that presents requirements for design and construction of structural concrete that are

intended to ensure public safety.

73.     ACI 318 is explicitly referenced throughout the Project plans and specifications for Concrete Collective's Work.

74.     As such, ACI 318 was used by Concrete Collective to inform its bid calculation and submission.

75.     One purpose of ACI 318 is to provide guidelines covering typical, industry standard requirements for construction of cast-in-place concrete structures.

76.     Consistent with industry standards and Concrete Collective's reasonable expectations, based on the information known to Concrete Collective at the time of bidding and Concrete Collective's longtime experience with the same specification section that was used on this Project, Concrete Collective bid the Project based on the reasonable expectation and understanding that ACI 318 would govern the cast-in-place structural concrete work.

77.     ACI 318 provides that non-contact rebar splices shall not exceed the minimum of 1/5 the splice length and 6 inches.

78.     In accordance with industry standards, common practice, and Concrete Collective's own expertise and experience with identical and similar specifications on other projects, Concrete Collective understood and expected at the time of bid that the RFP would identify any specification to be used that differed from ACI 318, and would also include a statement specifying the reason for the use of the differing criteria.

79.     Considering the location of the Project, the information available to Concrete Collective at the time of bidding, and relevant industry standards and practice, Concrete Collective did not anticipate, and could not reasonably have anticipated, that the Obama Foundation (through its engineering consultant, Thornton Tomasetti) would elect to impose the unusual and non-

standard requirements for rebar splices that were ultimately imposed.

80.     The foregoing assumptions by Concrete Collective were reasonable and consistent with standard industry practice.

81.     In fact, RFI Responses provided by Thornton Tomasetti between July 2022 and September 2022 acknowledged and validated Concrete Collective's assumptions and interpretation of the Project plans and specifications.

82.     Thornton Tomasetti's interpretation of rebar specifications on other parts of the Project, however, was inconsistent with Concrete Collective's interpretation of the plans and specifications and the reasonable assumptions informing Concrete Collective's bid.

83.     The non-standard requirements for rebar splices, as interpreted by Thornton Tomasetti, were atypical, unforeseen, not in accordance with industry standards, and were not contemplated in Concrete Collective's bid.

84.     As stated, Concrete Collective's bid did not include the additional time and costs associated with Thornton Tomasetti's inconsistent positions, which resulted in additional labor, materials, lost productivity and delay to the work.

85.     In or around the Spring of 2023, when it became apparent that unexpected requirements for inspections and RFIs were having a significant negative impact on Concrete Collective's estimated schedule and labor productivity, Concrete Collective took additional steps to try to mitigate delays and losses by, without limitation, issuing RFI #CON-1649, which requested clarification on noncontact splice criteria for the balance of the Project.

86.     Despite Concrete Collective's efforts to mitigate delays, the Obama Foundation's election to impose tolerances that differed from ACI 318, along with Thornton Tomasetti's inconsistent positions and extraordinary inspection requirements, contributed to Concrete

Collective's lost labor productivity and time-related cost increases.

87.     In total, Concrete Collective is entitled to, and has submitted a claim for, an equitable increase of the Concrete Collective Subcontract Price of at least $40,753,475, as claimed in the REA and Concrete Collective's Mechanics Lien.[5]

### E. The Defendants' Response to the REA

88.     On information and belief, Lakeside submitted Concrete Collective's REA, in whole or in part, to the Obama Foundation as a pass-through claim, and the Obama Foundation then sought input from Thornton Tomasetti regarding the causes of the additional costs claimed by Concrete Collective in the REA.

89.     Rather than acknowledge that Concrete Collective's additional costs were primarily the result of Thornton Tomasetti's unreasonable actions and inactions described herein (factors outside Concrete Collective's control), Thornton Tomasetti and Schneider chose to unfairly single out II in One by making false statements about II in One's relevant industry experience, performance and reputation.

90.     At the time Concrete Collective submitted its REA, Thornton Tomasetti knew or should have known that II in One had extensive experience performing concrete placement and rebar installation using specifications identical and/or similar to the relevant rebar specifications for the Project.

91.     In fact, II in One had successfully completed work using identical and/or similar rebar specifications on multiple projects, including projects where Thornton Tomasetti served as the project engineer.

92.     W.E. O'Neil had also successfully completed work using the same or similar rebar

---

[5] *See*, footnote 2, *supra*.

specifications.

93.     On one project, the American Airlines Hangar Replacement Project at O'Hare (the "O'Hare Project"), both W.E. O'Neil and II in One successfully completed work similar to the work that Concrete Collective performed on the Obama Presidential Center Project.

94.     Moreover, the fact that W.E. O'Neil and II in One performed successfully on the O'Hare Project without the need to submit a significant productivity claim supports Concrete Collective's contention that the requirements imposed by Thornton Tomasetti on the Obama Presidential Center Project were overly burdensome and beyond what was reasonably anticipated when Concrete Collective submitted its bid.

95.     On information and belief, Thornton Tomasetti had actual or constructive knowledge that II in One had successfully completed similar work on projects using the same or similar rebar specifications prior to II in One's participation in the Obama Presidential Center Project.

96.     Thornton Tomasetti has worked on other projects involving the same or similar specifications that are at the heart of the REA—projects in which both II in One and W.E. O'Neil properly performed concrete work in accordance with the required specifications. However, on those projects, Thornton Tomasetti did not attempt to enforce a non-standard and unreasonably burdensome interpretation of the subject specifications, as it did on the Obama Presidential Center Project.

97.     As stated, each of Concrete Collective's partner firms (including II in One) brought significant and crucial experience and value to the Project, which enabled Concrete Collective to achieve—and even exceed—the technical and workforce goals for the Project.

98.     Despite having actual or constructive knowledge that II in One had requisite skills

and experience to provide valuable and necessary contributions to the Project, the Defendants issued a letter to the Obama Foundation that singled out II in One and falsely indicated that II in One's alleged lack of sufficient qualifications and experience was the sole or primary cause of the unexpected cost increases incurred by Concrete Collective in completing its Work.

      **F.**    **The Defendants' Defamatory and Discriminatory Statements**

99.    Specifically, on or around February 5, 2024, Scott Schneider executed and delivered a memorandum to the Obama Foundation that singles out and unfairly criticizes II in One (the "Defamatory Memorandum"). In the Defamatory Memorandum, the Defendants state that Thornton Tomasetti has "successfully executed millions of square feet of construction in collaboration with…W.E. O'Neil using the same or substantially similar specification requirements," but that "[t]he construction issues were all unequivocally driven by the underperformance and inexperience of the concrete sub-contractor."

100.    A true and correct copy of the Defamatory Memorandum is attached hereto as *Exhibit A*.

101.    The Defamatory Memorandum further states that Thornton Tomasetti "bent over backwards to assist what everyone knows was a questionably qualified sub-contractor team in areas where a more qualified sub-contractor would not have required it."

102.    In another false statement about Concrete Collective (and its minority-owned joint venture partners, in particular), the Defamatory Memorandum states that "a more experienced contractor would not have had this many problems."

103.    The above-referenced statements by the Defendants constitute false statements of fact about II in One, its performance on the Project, and the experience and professional

qualifications of its officers and employees, including Bob McGee.

104.    Crucially, at the time the letter was sent, the Defendants and the Obama Foundation knew that W.E. O'Neil was the only joint venture partner of Concrete Collective that was not majority owned by African American(s).[6]

105.    Therefore, when the Defendants stated that Thornton Tomasetti "has successfully executed millions of square feet of construction in collaboration with Turner[7] and W.E. O'Neil using the same or substantially similar specification requirements," while also stating that "everyone knows" Concrete Collective was "a questionably qualified sub-contractor team," the clear and obvious implication of the Defendants' statements was that the minority-owned members of Concrete Collective were not sufficiently qualified to perform the Work, and that one or more of the minority-owned firms were the true cause of the Project delays and cost overruns.

106.    When the Defendants sent the Defamatory Memorandum, they also knew that II in One's participation in the Project included provision and training of many minority workers who had performed, and would perform, Concrete Collective's Work.

107.    When the Defendants sent the Defamatory Memorandum, they also knew that II in One was the only joint venture firm within Concrete Collective who performed the rebar installation Work that gave rise to the majority of costs claimed in Concrete Collective's REA.

108.    As such, when the Defendants told the Project Owner, falsely, that "[t]he construction issues were all unequivocally driven by the underperformance and inexperience of the concrete sub-contractor," the Defendants intended that the Owner interpret the Defendants'

---

[6] Trice is owned and managed by Stephanie Hickman, an African American woman whose father and uncles founded Trice in Chicago in 1967. W.E. O'Neil is a 100%-employee-owned company that is not majority owned by members of a racial minority.

[7] Turner refers to The Turner Construction Company. The Turner Construction Company is the only joint venture partner of Lakeside Alliance that is not majority owned by members of a racial minority.

statements as indicating that the "construction issues" were solely the fault of II in One and/or the II in One JV.

109.    The Defendants also intended that the Owner rely on the Defendants' false statements about II in One in making the decision to reject the REA.

110.    The Defendants' statements about II in One's performance and qualifications in the Defamatory Memorandum were false and contrary to the Project's factual record.

111.    On information and belief, the Defendants were motivated by racial animus toward Bob McGee, and/or, Oliver Fifer and/or other minority agents/employees of II in One and/or II in One JV, when Defendants published the defamatory statements alleged herein.

112.    The Obama Foundation relied on the Defendants' false statements about II in One when it made the decision to reject Concrete Collective's REA.

**G.      The Financial and Reputational Harm Caused by the Defendants' Actions**

113.    As a result of Thornton Tomasetti's and Schneider's Defamatory Memorandum and the Obama Foundation's reliance on the Defendants' false statements and denial of Concrete Collective's REA, II in One has suffered significant financial hardships, including, without limitation, the following:

a.      II in One lost millions of dollars on the Project and, as a result, has been unable to obtain surety credit necessary to bid on bonded projects;

b.      II in One was forced to fully draw down its bank line of credit and now has a significantly reduced line of credit;

c.      Because II in One's co-owner, Bob McGee, has personally guaranteed II in One's line of credit, he may be forced to personally seek bankruptcy relief, in addition to

closing II in One;

      d.    Concrete Collective may soon be forced to make a capital call requiring II in One to provide millions of dollars, which would result in II in One defaulting on the terms of Concrete Collective's joint venture agreement.

114.    In addition to the financial harm suffered by the Plaintiffs, the inability of II in One to bid on bonded projects (including public projects) has resulted, and will result, in fewer minority-owned, local contractors being available to bid on many Chicago-area projects.

**COUNT I**
**Race Discrimination in Violation of 42 U.S.C. § 1981**
**(By II in One, II in One Rebar and Concrete Collective)**

115.    Concrete Collective, II in One and II in One Rebar repeat, reallege and incorporate the allegations of Paragraphs 1 through 114 of this Complaint as if fully set forth as paragraph 115 of this Count I.

116.    Bob McGee and Oliver Fifer are members of a racial minority and the co-owners of II in One and II in One Rebar.

117.    As such, the racial identity of Bob McGee and Oliver Fifer is imputed to Concrete Collective, II in One and, II in One Rebar.

118.    Concrete Collective, II in One and II in One Rebar have standing to bring this claim against Defendants pursuant to Section 1981.

119.    42 U.S.C. § 1981 guarantees that all persons shall have the right to make and enforce contracts free from all forms of discrimination on the basis of race and national origin.

120.    The Defendants, and each of them, sent the Defamatory Memorandum with the intent to discriminate against Concrete Collective, II in One and II in One Rebar on the basis of

race.

121.    The discrimination alleged herein interfered with the rights of Concrete Collective, II in One and II in One Rebar to make and enforce contracts, including without limitation, the Concrete Collective Subcontract, the II in One JV Subcontract and other contracts related to the construction of the Project.

122.    As a result of the Defendants' discriminatory conduct in violation of Section 1981, Concrete Collective and II in One have suffered reputational and financial harm, including lost profits that they were entitled to receive as a result of their performance of Work on the Project. II in One has also lost profits due to II in One's inability to obtain surety credit necessary to bid on bonded projects, including public projects.

123.    As a result of the Defendants' discriminatory conduct in violation of Section 1981, II in One and II in One Rebar have both suffered reputational and financial harm, including lost profits that II in One JV was entitled to receive as a result of its performance of work on the Project.

124.    Accordingly, the Defendants, and each of them, have violated Plaintiffs' rights as protected by 42 U.S.C. § 1981.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs II in One, II in One Rebar and Concrete Collective, pray this Honorable Court enter an Order in their favor providing as follows:

(a)    Entering judgment in favor of Concrete Collective, II in One and II in One Rebar, and against Defendants;

(b)    Awarding Concrete Collective, II in One and II in One Rebar compensatory damages in an amount to be proven at trial sufficient to redress the harms that they have suffered, including reputational harm and loss of income of at least $40,753,475;

24

(c)    Awarding Concrete Collective, II in One and II in One Rebar, appropriate punitive damages in an amount to be proven at trial that would punish Defendants for their knowing, intentional, willful, and reckless disregard of clearly established federal statutory rights as alleged herein and enter any and all injunctive decrees and relief necessary to effectively prevent Defendants from engaging in similar unlawful racial discrimination in the future;

(d)    Awarding Concrete Collective, II in One and II in One Rebar reasonable attorneys fees and costs of this action; and

(e)    Granting all such other and further relief this Court deems equitable and just.

## COUNT II
## Libel *Per Se*

125.    Plaintiffs repeat, reallege and incorporate the allegations of Paragraphs 1 through 114 of this Complaint as if fully set forth as Paragraph 125 of this Count II.

126.    The Defendants, and each of them, made knowingly or negligently false statements about Collective Concrete, II in One, II in One Rebar and Bob McGee.

127.    The Defendants' knowing or negligently false statements about the Plaintiffs were published to third parties, including, the Obama Foundation and Lakeside.

128.    The Defendants' knowing or negligently false statements about Plaintiffs included false statements indicating that the Plaintiffs lacked abilities in their profession/business and/or were unable to perform their employment duties, including the inability to perform obligations under the Concrete Collective Subcontract and the II in One JV Subcontract on the Project.

129.    The Defendants, and each of them, knew or should have known that their statements about the Plaintiffs were false and/or Defendants lacked reasonable grounds to believe that such

statements were true.

130.    The Plaintiffs were damaged as a result of the Defendants' false statements.

131.    The damages suffered by the Plaintiffs as a result of the Defendants' false statements include, but are not limited to, lost profits that Plaintiffs were entitled to receive as a result of their performance of Work on the Project and lost profits due to II in One's inability to obtain surety credit necessary to bid on bonded projects, including public projects.

<b>PRAYER FOR RELIEF</b>

WHEREFORE, Plaintiffs pray this Honorable Court enter an Order in their favor providing as follows:

(a)    Entering judgment in favor of Plaintiffs and against Defendants;

(b)    Awarding Plaintiffs compensatory damages in an amount to be proven at trial sufficient to redress the harms that they have suffered, including loss of income of at least $40,753,475;

(c)    Awarding Plaintiffs appropriate punitive damages in an amount to be proven at trial that would punish Defendants for their knowing, intentional, willful, publication of false statements about the Plaintiffs;

(d)    Awarding Plaintiffs reasonable attorneys fees and costs of this action; and

(e)    Granting all such other and further relief this Court deems equitable and just.

<b>COUNT III<br>Tortious Interference with Contract<br>(By II in One, II in One Rebar and Concrete Collective)</b>

132.    Concrete Collective, II in One and II in One Rebar repeat, reallege and incorporate the allegations of Paragraphs 1 through 114 of this Complaint as if fully set forth as paragraph 132

26

of this Count III.

133.    A valid and enforceable contract exists between Concrete Collective and Lakeside, namely the Concrete Collective Subcontract.

134.    A valid and enforceable contract also exists between II in One and the other joint venture partners that form the Concrete Collective Joint Venture.

135.    A separate valid and enforceable contract also exists between II in One JV and Concrete Collective, namely the II in One JV Subcontract.

136.    A valid and enforceable contract also exists between Lakeside and the Obama Foundation.

137.    The Defendants, and each of them, were aware of each of the aforementioned contracts.

138.    The Defendants, and each of them, intentionally and unjustifiably induced a breach of the above-mentioned contracts by one or more of the following actions:

(a)     attempting to enforce a non-standard and unreasonably burdensome interpretation of the specifications applicable to Concrete Collective's Work; and

(b)     making false statements about Concrete Collective, II in One and II in One Rebar, as alleged herein; and

(c)     unlawfully discriminating against Concrete Collective, II in One and II in One Rebar on the basis of race as alleged herein.

139.    As a result of the Defendants' wrongful conduct (as described herein), Lakeside and the Obama Foundation breached their obligations to Concrete Collective, II in One, and II in One Rebar by failing to pay for the labor, materials and services Concrete Collective and II in One JV provided to the Project, including the costs claimed in the REA and Concrete Collective's

Mechanics' Lien.

140. The Defendants' interference with the above-described contracts was willful, malicious, and without just cause or right.

141. The Plaintiffs suffered damages as a result of the Defendants' tortious interference with the above referenced contracts, including lost profits that Plaintiffs were entitled to receive as a result of their performance of Work on the Project and lost profits due to II in One's inability to obtain surety credit necessary to bid on bonded projects, including public projects.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs II in One, II in One Rebar and Concrete Collective, pray this Honorable Court enter an Order in their favor providing as follows:

(a) Entering judgment in favor of Concrete Collective, II in One and II in One Rebar, and against Defendants;

(b) Awarding Plaintiffs compensatory damages in an amount to be proven at trial sufficient to redress the harms that they have suffered, including loss of income of at least $40,753,475;

(c) Awarding Plaintiffs appropriate punitive damages in an amount to be proven at trial that would punish Defendants for their knowing, intentional, willful, and malicious interference with Plaintiffs' contracts;

(d) Awarding Plaintiffs reasonable attorneys fees and costs of this action; and

(e) Granting all such other and further relief this Court deems equitable and just.

**COUNT IV**
**Tortious Interference with Business Relationships**

142. Plaintiffs repeat, reallege and incorporate the allegations of Paragraphs 1 through

114 of this Complaint as if fully set forth as Paragraph 142 of this Count IV.

143.    At the time of the Defendants' wrongful acts alleged herein, Concrete Collective, II in One and II in One Rebar had a reasonable expectation of entering into or continuing valid business relationships with multiple third parties, including without limitation, Lakeside Alliance, The Obama Foundation, Turner Construction Company, Powers & Sons Construction Company, UJAMAA Construction Inc., Brown and Momen, Inc., Safeway Construction Company, and other project owners and contractors in the Chicagoland area. Each of the Plaintiffs expected to receive an economic benefit as a result of the foregoing, including new and/or continued valid business relationships.

144.    The Defendants, and each of them, were aware of the foregoing business relationships and Plaintiffs' expectations.

145.    The Defendants, and each of them, intentionally and without justification interfered with Plaintiffs' expected new and continued business relationships by taking one or more of the following actions:

(a)    attempting to enforce a non-standard and unreasonably burdensome interpretation of the specifications applicable to Concrete Collective's Work; and

(b)    making false statements about Concrete Collective, II in One and II in One Rebar, as alleged herein; and

(c)    unlawfully discriminating against Concrete Collective, II in One and II in One Rebar on the basis of race as alleged herein.

146.    The Defendants' interference prevented the Plaintiffs' legitimate expectancy of new and/or continued business relationships from ripening into valid business relationships and

concomitant expected economic benefits to Plaintiffs.

147. The Defendants' interference with the Plaintiffs' legitimate expectancy of new and/or continued business relationships was willful, malicious, and without just cause or right.

148. The Plaintiffs suffered damages as a result of the Defendants' intentional and unjustified interference with the above expectancy, including lost profits that Plaintiffs were entitled to receive as a result of their performance of Work on the Project and lost profits due to II in One's inability to obtain surety credit necessary to bid on bonded projects, including public projects.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray this Honorable Court enter an Order in their favor providing as follows:

(a) Entering judgment in favor of Plaintiffs and against Defendants;

(b) Awarding Plaintiffs compensatory damages in an amount to be proven at trial sufficient to redress the harms that they have suffered, including loss of income of at least $40,753,475;

(c) Awarding Plaintiffs appropriate punitive damages in an amount to be proven at trial that would punish Defendants for their knowing, intentional, willful, and malicious interference with Plaintiffs' business relationships;

(d) Awarding Plaintiffs reasonable attorneys fees and costs of this action; and

(e) Granting all such other and further relief this Court deems equitable and just.

## JURY DEMAND

Plaintiffs request trial by jury.

Respectfully submitted,

**Robert J. McGee Jr., Concrete Collective, II in One Contractors, Inc. and II in One Rebar Inc.,**

By: */s/ John E. Sebastian*
 One of Their Attorneys

Kathleen O. Barnes
John E. Sebastian
Joel B. Daniel
Watt, Tieder, Hoffar & Fitzgerald, L.L.P.
10 S. Wacker Drive, Suite 1100
Chicago, IL 60606-7411
(312) 219-6900
(312) 559-2758 (Fax)
kbarnes@watttieder.com
jsebastian@watttieder.com
jdaniel@watttieder.com

20478302.3 104399.00002

31