**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| ROBERT J. MᶜGEE, JR. an individual, II IN ONE CONTRACTORS, INC., an Illinois Corporation, II IN ONE REBAR, INC., an Illinois Corporation, W.E. O'NEIL CONSTRUCTION CO., and TRICE CONSTRUCTION COMPANY. | |
| Plaintiffs, | |
| v. | Case No. 1:25-cv-600 |
| THORNTON TOMASETTI, INC., a New York Corporation and SCOTT A. SCHNEIDER, an individual. | Hon. Judge Jeffrey I. Cummings |
| Defendants. | |

**AMENDED COMPLAINT[1]**

Plaintiffs, Robert J. McGee, Jr. ("Bob McGee"), II In One Contractors, Inc. ("II In One"), II In One Rebar, Inc. ("II In One Rebar"), W.E. O'Neil Construction Co. ("W.E. O'Neil") and Trice Construction Company ("Trice"), by and through their attorneys, Kathleen O. Barnes, John E. Sebastian and Frank J. Marsico of Watt, Tieder, Hoffar & Fitzgerald, L.L.P., for their Amended Complaint against Defendants, Thornton Tomasetti, Inc. ("Thornton Tomasetti") and Scott A. Schneider ("Schneider"), state as follows:

**INTRODUCTION**

In a shocking and disheartening turn of events, the African American owner of a local construction company finds himself and his company on the brink of forced closure because of

---

[1] Plaintiffs' Amended Complaint attaches the same **Exhibit A** as Plaintiffs' Original Complaint and, in accordance with this Court's standing order, Plaintiffs attach to their Amended Complaint a redlined version of the Original Complaint, outlining all changes made to the Original Complaint, as **Exhibit B**.

racial discrimination by the structural engineer of record (Thornton Tomasetti) for the construction of The Obama Presidential Center. Thornton Tomasetti was hired by The Barack Obama Foundation (the "Obama Foundation" or "Owner") to serve as its structural engineer for the construction of The Obama Presidential Center ("OPC") located at 6001–6121 South Stony Island Avenue, in Chicago, Illinois (the "OPC Project" and/or "Project").

In a Memorandum dated February 5, 2024 written by Defendant Scott Schnieder of Thornton Tomasetti (hereinafter the "Defamatory Memorandum"), and circulated to the Obama Foundation and the OPC Project's general contractor, Lakeside Alliance ("Lakeside"), Defendants Schneider and Thornton Tomasetti state, among other things, that:

> . . . TT [Thornton Tomasetti] has successfully executed millions of square feet of construction in collaboration with Turner [Construction Company] and W.E. O'Neil [Construction Co.] using the same or substantially similar specification requirements [including but not limited to Structural Specification Section 032000]. Our specification requirements in this regard have never been an issue as portrayed here, including a current Project utilizing the same specification which W.E. O'Neil is building not far from the OPC [Obama Presidential Center Project].

> (See **Exhibit A**, bracketed material supplied for clarification).

After Thornton Tomasetti effectively praised W.E. O'Neil and Turner (two large, non-minority owned firms) for their success on other prior, current and/or subsequent projects using the same or substantially similar specification requirements, Defendants' Defamatory Memorandum then separately refers to a "questionably qualified subcontractor team" only two more paragraphs below, as follows:

> . . .TWBTA [OPC Project architect] and TT [Thornton Tomasetti] bent over backwards to assist what everyone knows was a questionably qualified subcontractor team in areas where a more qualified sub-contractor would not have required it.

> (See **Exhibit A**, bracketed material supplied for clarification).

The Obama Foundation, the general contractor [Lakeside Alliance] and all other parties

involved with the OPC Project knew that the only two parties involved with the scopes of work complained of in the Defamatory Memorandum were W.E. O'Neil and the II In One JV (a joint venture between two African-American minority subcontractors co-owned by Plaintiff Robert J. McGee, Jr. and Oliver Fifer, both of whom are African American). Given that the Defamatory Memorandum had already effectively praised W.E. O'Neil for performing "millions of square feet" of the same type of work "using the same or substantially similar specification requirements," said parties knew that Defendants' Schneider's and Thornton Tomasetti's reference to a "questionably qualified subcontractor team," by process of elimination, *necessarily* had to be referring to the only remaining entities involved with the subject scopes of work in question, namely the African-American owned minority subcontractors II In One Contractors, Inc., II In One Rebar, Inc. and the II In One Contractors/Rebar JV (collectively the "II In One Entities").

However, Defendant Schneider (the author of the Defamatory Memorandum) knew or should have known that Thornton Tomasetti and W.E. O'Neil (both larger, non-minority owned firms) were *not only* involved with other, separate projects which commenced *prior to* the OPC Project (such as the Oakbrook Commons Project referenced below), but also another project which commenced *after* the OPC Project (such as the Wind Creek Project referenced below), whereby the same or substantially similar specification requirements were not only used (including but not limited to Structural Specification Section 032000) and approved by Thornton Tomasetti, but where W.E. O'Neil *also implemented said specification requirements in the same manner* as W.E. O'Neil and the II In One Entities did on the OPC Project.

Even more significantly, Defendant Schneider also knew or should have known that for yet another prior project, namely the American Airlines Hangar at O'Hare International Airport (the "O'Hare Project"): (a) not only were Thornton Tomasetti and W.E. O'Neil involved, but II In

One was as well; and (b) that II In One also *implemented the same or substantially similar specification requirements* (including Section 032000) *in the same manner* as II In One did on the OPC Project, and also as W.E. O'Neil did on the Oakbrook Commons and Wind Creek Projects. Again, while Thornton Tomasetti accepted these implementations not only on the *prior* O'Hare and Oakbrook Commons Projects, *but also on the subsequently-commenced* Wind Creek Project, Defendants Schneider and Thornton Tomasetti nevertheless rejected this same implementation on the OPC Project.

The only reasonable, and necessary implications that can be drawn from the Defendants' foregoing statements is that the various issues complained of by Defendants Schneider and Thornton Tomasetti were (allegedly) *exclusively caused by the "questionably qualified" African-American minority owned subcontractors in question* [the II In One Entities], whereas a "qualified" or a "more experienced contractor" [such as the non-minority owned firms specifically referenced and praised by Defendants, W.E. O'Neil and Turner] "would not have had this many problems." Stated differently, given the foregoing statements and circumstances, the only reasonable conclusion to be drawn is that the foregoing statements in Defendants' Defamatory Memorandum were driven exclusively by racial animus. Despite Plaintiffs' dedicated performance efforts and commitment to the Obama Foundation's stated goals for the Project, and as demonstrated by the foregoing circumstances, the II In One Entities, were subjected to baseless criticisms and defamatory and discriminatory accusations by the Obama Foundation's structural engineer, Thornton Tomasetti. Thornton Tomasetti's defamatory and discriminatory statements came as a shock to the II In One Entities and their Owner, Robert J. McGee, Jr., who remains proud of his companies' work on a Project intended to honor the legacy of the United States' first African American President.

Prior to working on the Project, the II In One Entities had successfully completed many high-profile projects in the Chicagoland area, including Projects utilizing the same specification section that is central to this dispute. Moreover, Bob McGee was aware and supportive of the Obama Foundation's diversity and inclusion goals for the Project and never imagined that the Obama Foundation's structural engineer would single out minority-owned subcontractors for unfair criticism and falsely accuse the II In One Entities of lacking sufficient qualifications and experience to perform their Work, while, in the same defamatory memorandum dated February 5, 2024, stating that the non-minority-owned contractors were sufficiently qualified. As a direct result of the Defendants' unlawful, discriminatory and defamatory statements and actions, the II In One Entities, along with Plaintiffs W.E. O'Neil and Trice, have suffered extreme financial loss and reputational harm, as further alleged below.

## PARTIES

1.      Plaintiff, II In One Contractors, Inc. ) is an Illinois Corporation with its principal place of business located at 4344 West 45th Street in Chicago, Illinois. It is a 40-year-old, minority-owned business in the business of providing general contracting, concrete construction, construction management and design-build services.

2.      Plaintiff Bob McGee is a resident of the Kenwood community area in Chicago and an owner and co-founder of II In One. As an African American, Bob McGee is a member of a racial minority.

3.      Bob McGee is one of two co-owners of II In One. The other co-owner is Oliver B. Fifer ("Oliver Fifer"). Like Bob McGee, Oliver Fifer is an African American and a resident of Chicago, Illinois.

4.      II In One, W.E. O'Neil and Trice are the three Chicago-based construction

companies comprising the joint venture known as Concrete Collective. (Hereinafter II In One, W.E. O'Neil and Trice may also be collectively referenced as "Concrete Collective"). Concrete Collective's principal place of business is located at 1245 W. Washington Blvd. in Chicago, Illinois.

5.      Plaintiff Trice Construction Company is an Illinois Corporation with its principal place of business at 438 W. 43rd Street in Chicago, Illinois. Trice is a 57-year-old, African-American minority and women-owned business in the business of providing concrete construction services.

6.      Plaintiff W.E. O'Neil Construction Co. is an Illinois corporation with its principal place of business at 1245 W. Washington Blvd. in Chicago, Illinois. W.E. O'Neil is a 100%-employee-owned business founded in Chicago in 1925, which is in the business of providing general contracting and other construction services in a wide range of market sectors. W.E. O'Neil is not a minority-owned business.

7.      Plaintiff II In One and Plaintiff II In One Rebar collectively form a joint venture known as II In One Contractors/Rebar JV ("II In One JV").

8.      Like II In One, II In One Rebar is an African-American minority owned Illinois Corporation that is jointly owned by Bob McGee and Oliver Fifer.

9.      II In One, II In One JV and II In One Rebar all have the same principal place of business, which is 4344 West 45th Street in Chicago, Illinois. (Hereinafter II In One, II In One Rebar and II In One JV may be collectively referenced as the "II In One Entities").

10.      Defendant Thornton Tomasetti, Inc. is a New York corporation, with its principal place of business located at 120 Broadway, New York, NY 10271-0016. Thornton Tomasetti is in the business of providing engineering and other professional design services.

11.     Defendant Scott A. Schneider is a resident of the State of New York. He is an officer, employee and/or agent of Thornton Tomasetti, where he has the title of Senior Principal & Structural Engineering Practice Co-Leader.

## NATURE OF THE ACTION

12.     Count I of this Complaint alleges a cause of action for discrimination in violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981"). Counts II, III, IV and V allege causes of action for libel per se, libel per quod, tortious interference with contract, and tortious interference with business relationships, respectively, and seek recovery of monetary damages resulting from the Defendants' discriminatory and false statements about the Plaintiffs.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the claims alleged in Count I arise under the laws of the United States, and this Court has supplemental jurisdiction over the claims alleged in Counts II, III, IV and V pursuant to 28 U.S.C. § 1367.

14.     In addition, this Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(a)(1) in that the matter in controversy, exclusive of interest and costs, exceeds the sum or value of $75,000 and is between citizens of different States.

15.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because the events, acts, and/or omissions giving rise to Plaintiffs' claims occurred within this judicial district, and more specifically, within the City of Chicago.

## FACTS COMMON TO ALL COUNTS

**A.      Summary of the Project and the Obama Foundation's Stated Goals and Commitments**

16.     Concrete Collective was and is a major, structural subcontractor for the Project.

7

The Owner of the Project is the Obama Foundation, and Lakeside Alliance ("Lakeside") served as the Obama Foundation's Construction Manager and General Contractor for the Project .

17.     Upon information and belief, and based upon Project-related information and documentation presently in Plaintiffs' possession or otherwise available to Plaintiffs, Lakeside is an Illinois general partnership, and/or is a joint venture between Turner Construction Company ("Turner") and four other companies: Powers & Sons Construction Company, UJAMAA Construction Inc., Brown and Momen, Inc., and Safeway Construction Company.

18.     Upon information and belief, and based upon OPC Project documents presently in Plaintiffs' possession, on or around March 17, 2021, The Obama Foundation entered into an Amended and Restated Pre-Construction and Construction Agreement with Lakeside to serve as General Contractor and Construction Manager for the Project (hereinafter the "General Contract," which is incorporated herein by reference).

19.     Thereafter, Lakeside entered into a Subcontract Agreement with Concrete Collective dated May 27, 2021 to provide the Project's cast-in-place concrete labor and materials (hereinafter the "Concrete Collective Subcontract," which is incorporated herein by reference).

20.     On or around August 30, 2021, II In One JV entered into a written subcontract agreement with Concrete Collective to perform a portion of Concrete Collective's Work on the Project (the "II In One JV Subcontract," which is incorporated herein by reference).[2]

21.     Specifically, pursuant to the II In One JV Subcontract, II In One JV agreed to provide, and did provide, labor, materials, and equipment to the Project for rebar installation, concrete pouring, concrete forming and/or other similar and related work.

---

[2] Although Plaintiffs are of the belief that Thornton Tomasetti and Schneider are already in possession of the General Contract, the Concrete Collective Subcontract and/or the II In One JV Subcontract, undersigned counsel for Plaintiffs has nevertheless provided copies of said contracts/subcontracts to undersigned counsel of record for Thornton Tomasetti and Schneider.

22.     The initial subcontract price of the II In One JV Subcontract was $27,025,966.00.

23.     Upon information and belief, based upon OPC Project documentation presently in Plaintiffs' possession, and based upon and consistent with the allegations and documentation referenced in this Amended Complaint, the Obama Foundation also entered into a written contract with Thornton Tomassetti to serve as the Obama Foundation's Engineer of Record for the Project.

24.     As Thornton Tomasetti's Senior Principal & Structural Engineering Practice Co-Leader assigned to the Project, Scott Schneider was tasked with managing Thornton Tomasetti's work on the Project.

25.     Among other things, the General Contract established and memorialized certain diversity and inclusion requirements and goals for the Project.

26.     Specifically, Exhibit 4.8 of the General Contract, states in pertinent part:

**Owner is committed to maintaining an environment in which diversity and inclusion are valued and respected in all aspects of its operations as well as the operations of its partners and third-party contractors**. Construction Manager hereby covenants that it shall at all times comply with (i) the Diversity and Inclusion Plan, and (ii) the Commitments and all other requirements set forth in this Exhibit 4.8.

**Owner's diversity and inclusion requirements and goals are of the utmost importance. Construction Manager hereby acknowledges that its performance in implementing and executing the Diversity and Inclusion Plan is critical to Construction Manager's ability to comply with this Exhibit 4.8, including achieving the Commitments. Construction Manager also acknowledges that its general business conduct shall reflect the spirit and values of Owner's diversity and inclusion goals broadly** (emphasis added).

27.     Schedule 1A to Exhibit 4.8 of the General Contract further memorializes Lakeside's commitment to delivering the Project by transparent and inclusive means, stating in pertinent part:

**Construction Manager aims to practice a holistic approach to creating economic opportunity and sustaining economic growth by striving to address and provide solutions to barriers that have historically prevented**

9

**disadvantaged businesses from participating on projects of this magnitude, as well as creating opportunities and providing resources within the construction trades for residents of historically disadvantaged neighborhoods.** Construction Manager will supplement the expectations outlined below with transparency by way of regular community engagement and by enlisting relevant subject matter experts when necessary. All acts will be in the service of the creation of a blueprint for a robust workforce and supplier diversity program. (emphasis added).

28.     Because Concrete Collective was only provided a redacted copy of the General Contract, Concrete Collective does not have knowledge of all diversity and inclusion requirements applicable to Lakeside under the General Contract.

29.     Additionally, none of the Plaintiffs was provided with a copy of contract between the Obama Foundation and Thornton Tomasetti. However, upon information and belief, based upon Project documentation presently in Plaintiffs' possession, and based upon and consistent with the allegations and documents referenced in this Amended Complaint, the Obama Foundation required Thornton Tomasetti to provide its Project services in a manner consistent with the Obama Foundation's commitments and goals for the Project, including the diversity and inclusion goals and the requirement to create economic opportunity and growth to historically disadvantaged businesses described herein.

30.     The General Contract also requires Lakeside to provide the Obama Foundation with certain reports regarding Lakeside's efforts to comply with the diversity and inclusion goals and commitments for the Project.

31.     In January 2023, Lakeside published its "Obama Presidential Center 2022 Diversity, Equity & Inclusion Report" (the "2022 DEI Report").

32.     As of November 12, 2024, a copy of the 2022 DEI Report was available on Lakeside's website at the following link: https://www.lakesidealliance.com/2022-diversity-

equity-inclusion-report.

33.     The 2022 DEI Report includes the following goals and commitments of Lakeside:

As builders of the Obama Presidential Center, Lakeside Alliance endeavors to transform the construction paradigm in Chicago through intentional engagement with business and our community.

*** 

We are committed to ensuring this historic project not only celebrates the legacy of our nation's first African American President, but it also benefits local residents, creates jobs, drives investment into the community and ushers in a new, more inclusive era of construction in Chicago.

34.     The 2022 DEI Report also sets forth Lakeside's "Values & Commitments" with respect to the Project, which include the following:

We will expand career opportunities in both the professional field and the union trades for historically underrepresented populations. **We will achieve significant diverse workforce participation by ensuring individuals have equal access to information, training, apprenticeships, and job opportunities**—while removing the barriers that prevent individuals from reaching their full potential.

*** 

We are committed to **achieving significant diverse business participation** by intentionally ensuring an inclusive and transparent procurement process, **offering equal access to significant contract opportunities, removing historical barriers, and providing support and resources to ensure their success.** (emphasis added).

### B.      Summary of Defendants' Defamatory Memorandum of February 5, 2024 and Related Impacts

35.     Despite the Obama Foundation's stated goals and commitments to diversity and inclusion and ensuring equal access to contract opportunities and success on the Project,  Thornton Tomasetti and Scott Schneider subjected the Plaintiffs, and particularly the II In One Entities, to unjustified, racially discriminatory and defamatory conduct and statements, as described herein, which directly undermined the Obama Foundation's DEI goals and commitments and mission to bring transformative change to the construction industry and local community by providing solutions to barriers that have historically prevented disadvantaged businesses from participating

11

on projects of this magnitude.

36.     The statements and actions of Thornton Tomasetti and Scott Schneider not only undermined the Obama Foundation's stated goals and commitments but also violated Section 1981 of the Civil Rights Act of 1866.

37.     In addition, as a result of the Defendants' defamatory and discriminatory statements and actions that are more specifically described below and that were specifically directed to the African-American minority-owned II In One Entities, and also to Bob McGee (who is African American), Plaintiffs have suffered extreme financial losses, and either or both of the II In One Entities may also be forced to close.

38.     As described in more detail below, Thornton Tomasetti and Schneider issued a February 5, 2024 Memorandum to the Obama Foundation (hereinafter the "Defamatory Memorandum," attached hereto and incorporated herein by reference as **Exhibit A**), indicating that various problems encountered on the Project, such as delays, allegedly non-compliant work and cost overruns were the result of "…what everyone knows was a questionably qualified sub-contractor team in areas where a more qualified sub-contractor would not have required it [Thornton Tomasetti's and the Project architect's assistance]." (See **Exhibit A**, last page, bracketed material provided for clarification).  At the same time, the Defamatory Memorandum also expressly stated that:

> ". . . TT [Thornton Tomasetti] has successfully executed millions of square feet of construction in collaboration with Turner [the only non-minority owned joint venture member of the Lakeside Alliance] and W.E. O'Neil [the only non-minority owned joint venture member of Concrete Collective] using the same or substantially similar specification requirements.  Our [Thornton Tomasetti's] specification requirements in this regard have never been an issue as portrayed here, including a current Project utilizing the same specification which W.E. O'Neil is

building not far from the OPC.

(See **Exhibit A**, last page; bracketed material provided for clarification).

39.      Upon information and belief, based upon project records presently in W.E. O'Neil's possession, W.E. O'Neil believes that Schneider's reference to the "current Project utilizing the same specification which W.E. O'Neil is building not far from the OPC" refers, at least in part, to what is known as contractual structural specification Section 032000 – Concrete Reinforcing, and is also referring to either of the following projects: (1) the project known as the Oakbrook Commons Building E project located in Oakbrook, IL ("Oakbrook Commons Project"), which commenced *prior to* the OPC Project, and where the structural engineer was Thornton Tomasetti, the general contractor was W.E. O'Neil, and the concrete subcontractor was McHugh Construction Company ("McHugh," which like W.E. O'Neil, is not and was not a minority owned contractor); or (2) the project known as the Wind Creek Chicago Southland project located in East Hazel Crest, IL ("Wind Creek Project"), which commenced *after* the OPC Project (but was still ongoing as of the Defamatory Memorandum date of February 5, 2024), and where the structural engineer was Thornton Tomasetti, the general contractor was W.E. O'Neil, and the concrete subcontractor was also W.E. O'Neil. Regardless of which of these two projects Defendant Schneider was in fact referring to when he authored the Defamatory Memorandum, Schneider knew or should have known about the circumstances pertaining to both the Oakbrook Commons and Wind Creek Projects as referenced in this paragraph.

40.      Defendant Schneider, at the time he authored the Defamatory Memorandum, also knew or should have known that on another prior project, namely the American Airlines Hangar Replacement Project at O'Hare (the "O'Hare Project"), that Thornton Tomasetti was also the structural engineer, and that both W.E. O'Neil and II In One successfully completed work involving the same or substantially similar specification requirements, and implementations

13

thereof, as on the Oakbrook Commons, the Wind Creek and OPC Projects. Despite these circumstances, and despite fact that Thornton Tomasetti approved those same implementation methodologies for the prior O'Hare and Oakbrook Commons Projects, and also for the subsequently-commenced Wind Creek Project, Schneider and Thornton Tomasetti nevertheless did not approve that same implementation methodology as used by Concrete Collective on the OPC Project.

41.     In addition to the foregoing discriminatory, defamatory and false comments by Schneider, he also made the following, additional discriminatory, defamatory and false comments in the Defamatory Memorandum:

(1)     "The construction issues were all unequivocally driven by the underperformance and inexperience of the concrete sub-contractor…;" and

(2)     "[A] more experienced contractor would not have had this many problems."

(See **Exhibit A**, at first and fifth pages thereof).

42.     After the Obama Foundation received the Defendants' February 5, 2024 Defamatory Memorandum, the Obama Foundation forwarded the Defamatory Memorandum to Lakeside by correspondence dated February 7, 2024.

43.     Scott Schneider, Thornton Tomasetti, the Obama Foundation and Lakeside (including Turner and each of Lakeside's remaining joint venture members) each knew that: (a) all concrete and rebar related scopes of work on the Project were performed or to be performed solely by any one or more of W.E. O'Neil, II In One, II In One Rebar and/or Trice; (b) the purported and specific Project-related problems, issues and claims referenced by Schneider in the Defamatory Memorandum were more specifically within the scopes of work of W.E. O'Neil and the II In One Entities (but not Trice's direct scope of work); and (c) that W.E. O'Neil was the only

non-minority owned entity amongst them.

44.    In light of the content of the Defamatory Memorandum, including but not limited to the portions quoted above, combined with the foregoing circumstances, both the Obama Foundation and Lakeside, upon receiving and reading Defendants' Defamatory Memorandum, necessarily would have understood that Defendants' references to "a questionably qualified subcontractor team," and other racially-motivated, false and defamatory statements further referenced herein, were necessarily directed solely toward the only African-American minority owned entities performing the allegedly problematic portions of the Project's concrete and rebar related scopes of work as referenced in the Defamatory Memorandum, namely II In One and II In One Rebar, and not to W.E. O'Neil, the only non-minority entity involved with the foregoing, allegedly problematic portions of those scopes of work.

45.    In essence, the Defendants, through the Defamatory Memorandum, and including but not limited to the above-quoted portions thereof, told the Project Owner, falsely: (1) that all of the Project delays, performance issues, non-compliant work, cost overruns and other problems related to the concrete and rebar scopes of work were the fault of solely of the "questionably qualified" minority-owned subcontractor firms (i.e., the II In One Entities, rather than W.E. O'Neil); and (2) that "more qualified" firms (such as the firms that happen not to be owned by racial minorities, i.e., Turner and W.E. O'Neil) would not have required as much assistance or had as many "problems" with Thornton Tomasetti's "same" or "substantially similar" specification requirements that "have never been an issue" with Turner and W.E. O'Neil, including on a separate, current project also involving W.E. O'Neil.

46.    The Defendants intended that the Obama Foundation would rely on the Defendants' false, defamatory and discriminatory statements as contained in the Defamatory Memorandum,

15

and it was reasonably foreseeable to both of the Defendants that the Defamatory Memorandum itself, and/or the discriminatory, defamatory and false contents thereof, would be republished or repeated by the Obama Foundation to Lakeside and other persons or parties as well.

47. The Obama Foundation, along with Lakeside, both ultimately did in fact rely on the Defendants' discriminatory and false statements about the II In One Entities' purportedly questionable qualifications and purportedly deficient performance when the Obama Foundation and Lakeside both subsequently rejected Concrete Collective's claims for the additional costs incurred as a result of changed conditions.[3] As a direct result of those decisions, which in turn resulted from Defendants discriminatory, false and defamatory conduct and statements, each of Concrete Collective's partner entities (II In One, Trice and W.E. O'Neil), as well as II In One Rebar, have suffered substantial and unjust financial and reputational harm, and by extension, so have their employees and the local communities impacted by the Project.

48. As a direct result of the Defendants' discriminatory, false and defamatory statements (and the Obama Foundation's and Lakeside's reliance thereon), Plaintiffs have suffered monetary damages in the initial amount of at least $40,753,475.00, exclusive of attorneys fees, interest and other compensable costs. In addition, Bob McGee and the II In One Entities, and also

---

[3] In May 2023, after completing approximately 35% of its Work, Concrete Collective submitted a Request for Equitable Adjustment (the "REA") to Lakeside. Concrete Collective's initial request in the REA sought payment in the initial amount of $19,838,916 for then-known schedule and cost impacts incurred by Concrete Collective through no fault of its own. Lakeside passed through the REA to the Obama Foundation, but most of the costs requested in the REA were rejected by the Obama Foundation, and ultimately by Lakeside as well. The Foundation's and Lakeside's ultimate rejection of the majority of the REA, which was based on the defamatory and discriminatory statements and actions of Thornton Tomasetti, resulted in Concrete Collective's partner firms having to self-fund an amount which presently approaches $41,000,000 of its Work. When the REA was initially submitted, the full extent of additional costs from unexpected and changed conditions was not yet known. Now that Concrete Collective's Work is nearly complete, the additional costs incurred total no less than $40,753,475.00. Accordingly, Concrete Collective has recorded a Mechanics Lien in the amount of $40,753,475.00, which represents the principal amount owed and unpaid to Concrete Collective for Work it completed on the Project as of August 31, 2024.

by extension, W.E. O'Neil and Trice as the remaining members of the Concrete Collective, have suffered reputational harm and concomitant lost income as a direct result of Thornton Tomasetti's and Schneider's defamatory and discriminatory statements and actions.

C. **II In One Entities' History, Experience and Professional Reputation**

49.    Bob McGee began his construction career as a tradesman in Chicago and has worked in the local construction industry for more than 51 years.

50.    During his 51 years in the construction industry, Bob McGee has worked as a project manager, estimator, engineer and superintendent and currently serves as Operations Manager.

51.    Bob McGee holds a B.S. degree in Commerce and Accounting from DePaul University and is a member of the American Concrete Institute and the former President of Associated Steel Erectors.

52.    He has also successfully managed  the II In One Entities for more than forty years.

53.    Over the last 40+ years, the II In One Entities built a reputation as a premier minority-owned business in the Chicagoland construction industry.

54.    The II In One Entities have developed strong relationships and a reputation for excellence among their clients and industry partners; as well as relationships and a reputation that has helped them operate successfully and profitably for more than forty years.

55.    Without limitation, the II In One Entities have developed a reputation for specialized expertise and excellence in the areas of carpentry, concrete placement, reinforcement steel installation and structural steel erection.

56.    In addition, the II In One Entities have a reputation for commitment to the development and training of their employees, including members of racial and ethnic minorities from communities in the South Side neighborhoods of Chicago. As a result, many members of the

17

II In One Entities' management team have risen through the ranks from apprenticeship level to hold positions as project managers, superintendents and foremen.

57.    The II In One Entities also have a longstanding practice of engaging residents in local neighborhoods of active projects (including neighborhoods in and around the South Side of Chicago) to hire and train for current projects, and of establishing relationships leading to long-term hiring pipelines.

58.    In addition to being a co-founder and co-owner of the II In One Entities, Bob McGee currently serves as their President, Operations Manager and Project Executive.

59.    The II In One Entities used their extensive expertise and experience (as described herein) to bring critical knowledge, skills and value to the Concrete Collective joint venture team and to the Project.

60.    More specifically, the II In One Entities provided Concrete Collective and the Project with both technical expertise related to concrete placement and reinforcing steel installation, as well as critical workforce participation leadership required to meet the workforce participation goals established by the Obama Foundation for the Project.

61.    Prior to participating in the Obama Presidential Center Project, the II In One Entities successfully completed numerous, high value contracts on major Chicagoland projects, including but not limited to the above-referenced O'Hare, Oakbrook Commons and Wind Creek Projects.

62.    Despite the II In One Entities' extensive experience and crucial expertise, said Plaintiffs were subjected to unwarranted critiques of their qualifications by the Defendants.

63.    Upon information and belief, and based upon the circumstances, documentation, information presently in Plaintiffs' possession, and based upon and consistent with allegations

referenced elsewhere in this Amended Complaint, Lakeside and/or the Obama Foundation relied, in part, on their knowledge of II In One's, W.E. O'Neil's and Trice's experience and excellent reputations when they chose to award the Concrete Collective Subcontract.

64.    As evidenced by the racially-motivated defamatory statements made by Schneider in the Defamatory Memorandum, the Defendants falsely and unfairly criticized the performance of and made defamatory and discriminatory statements directed to the II In One Entities, given their status as minority (African American) owned contractors.

65.    Moreover, the Obama Foundation and Lakeside relied on the false, defamatory and discriminatory actions of the Defendants when they ultimately denied Concrete Collective's claim for additional compensation, as set forth in its Request for Equitable Adjustment of May 2023 (the "REA").

**D.    Concrete Collective's Bid for OPC Project**

66.    When Concrete Collective prepared its bid for the Concrete Collective Subcontract, Concrete Collective developed its original GMP estimate in a transparent manner between November 2020 and April 2021, informed by the Contract Documents, including plans and specifications provided by Lakeside and the Obama Foundation, and the Parties' preconstruction efforts.

67.    Lakeside and the Obama Foundation represented and warranted that the plans and specifications were complete and adequate, and that they accurately depicted the Work to be performed by Concrete Collective. Concrete Collective relied on those representations in preparing its bid and executing the Concrete Collective Subcontract.

68.    The assumptions made by Concrete Collective in developing its bid were reasonable, particularly in light of the collective experience and qualifications of its constituent members, and particularly in light of their collective experience with multiple prior, similar

projects involving the same or substantially similar specification requirements (including but not limited to the Oakbrook Commons and O'Hare Projects, both of which also involved Thornton Tomasetti and W.E. O'Neil, as well as II In One on the O'Hare Project), and its original GMP estimate was competitively bid.

69.     Concrete Collective's bid productivity and price did not, and could not, account for the aforementioned unforeseen factors outside its control, including, *inter alia*, the time and associated lost productivity resulting from Concrete Collective's necessary efforts to comply with Thornton Tomassetti's unreasonable interpretation of certain plans and specifications imposed by Thornton Tomasetti and the Obama Foundation.

70.     The original Guaranteed Maximum Price ("GMP") for Concrete Collective's Scope of Work, as set forth in the Concrete Collective Subcontract dated May 27, 2021, was $92,912,937.00.

### E.     **Thornton Tomasetti's Unexpected Interpretation of Project Specifications In Conjunction with ACI 318**

71.     The American Concrete Institute's ("ACI") Building Code is a standardized document that presents requirements for design and construction of structural concrete that are intended to ensure public safety.

72.     ACI Specification 318 ("ACI 318") is explicitly referenced throughout the Project plans and specifications for Concrete Collective's Work.

73.     One purpose of ACI 318 is to provide guidelines covering typical, industry standard requirements for construction of cast-in-place concrete structures.

74.     ACI 318 provides that non-contact rebar splices shall not exceed the minimum of 1/5 the splice length and 6 inches.

75.     At all relevant times, Thornton Tomassetti and/or Schneider were aware, or should

have been aware, of the American Concrete Institute's standards and industry customs regarding governing rebar spacing and tolerance requirements for lap splices, including ACI 318.

76.     Consistent with industry standards and Concrete Collective's reasonable expectations, ACI 318 was therefore used by Concrete Collective to inform its bid calculation and submission for the OPC Project, consistent with Concrete Collective's experience with separate, prior projects using the same or substantially similar contract/specification requirements (including but not limited to the Oakbrook Commons and O'Hare Projects, both of which also involved Thornton Tomasetti and W.E. O'Neil, and also II In One on the O'Hare Project) that were to be used for the OPC Project.

77.     At all relevant times, Thornton Tomasetti and/or Schneider also were aware, or should have been aware, of how the exact same or substantially similar contract specifications and requirements for rebar spacing and tolerance requirements, as well as the inspection requirements and RFI process on the OPC Project, should have been applied or implemented in the same fashion as for prior projects involving Thornton Tomasetti, Turner and/or W.E. O'Neil (such as the Oakbrook Commons Project), as Concrete Collective understood and contended before, at the time of and after submitting its REA claim for the OPC Project.

78.     In accordance with industry standards, common practice, and Concrete Collective's own expertise and experience with identical and similar specifications on other projects, Concrete Collective understood and expected at the time of bid that the RFP would identify any specification to be used that differed from ACI 318, and would also include a statement specifying the reason for the use of the differing criteria.

79.     Considering the location of the Project, its prior experience with other prior projects such as the Oakbrook Commons and O'Hare Projects, the information available to Concrete

Collective at the time of bidding, relevant industry standards and practice, Concrete Collective did not anticipate, and could not reasonably have anticipated, that the Obama Foundation (through its engineering consultant, Thornton Tomasetti) would elect to impose the unusual and non-standard requirements for rebar splices that were ultimately imposed.

80.     The foregoing assumptions by Concrete Collective were reasonable and consistent with standard industry practice, as well as its own experience on other, prior projects using the same or substantially similar specification requirements.

81.     In fact, RFI Responses provided by Thornton Tomasetti between July 2022 and September 2022 acknowledged and validated Concrete Collective's assumptions and interpretation of the Project plans and specifications, including but not limited to the interpretations as to Specification Section 032000.

82.     Thornton Tomasetti's interpretation of rebar specifications on other parts of the Project, however, was not only inconsistent with Concrete Collective's interpretation of the plans and specifications and the reasonable assumptions informing Concrete Collective's bid, but also inconsistent with such interpretations that Thornton Tomasetti itself used on the prior O'Hare and Oakbrook Commons Projects, as well as the subsequent Wind Creek Project.

83.     The non-standard requirements for rebar splices, as improperly interpreted by Thornton Tomasetti on the OPC Project, were atypical, unforeseen, not in accordance with industry standards such as ACI 318, were not contemplated, and could not have been reasonably contemplated in Concrete Collective's bid, given the circumstances as explained above.

84.     As stated, Concrete Collective's bid did not include the additional time and costs associated with Thornton Tomasetti's inconsistent and improper positions and interpretations,

which resulted in additional labor, materials, lost productivity and delay to the work.

F. **Concrete Collective's REA of May 2023**

85.    In or around the Spring of 2023, when it became apparent that unexpected requirements for inspections and RFIs were having a significant negative impact on Concrete Collective's estimated schedule and labor productivity, Concrete Collective took additional steps to try to mitigate delays and losses by, without limitation, issuing RFI #CON-1649, which requested clarification on noncontact splice criteria for the balance of the Project.

86.    Despite Concrete Collective's foregoing efforts, the Obama Foundation's election to impose tolerances that differed from ACI 318, along with Thornton Tomasetti's inconsistent positions and extraordinary inspection requirements as compared to the O'Hare, Oakbrook Commons and Wind Creek Projects, contributed to Concrete Collective's lost labor productivity and time-related cost increases which are at the heart of its REA of May, 2023.

87.    Plaintiffs' REA of May 2023 was significantly based upon and related to Thornton Tomasetti's improper and unanticipated decision on the OPC Project to impose rebar splice spacing and tolerance requirements, as well as excessively rigorous and unnecessary inspection and Request For Information (RFI) processes, that not only differed from the American Concrete Institute ("ACI") standards that formed the basis of Concrete Collective's bid for the Project, but which were also contrary to construction industry standards and customary practices, and contrary to other prior and subsequent projects involving Thornton Tomasetti, W.E. O'Neil and other parties (such as the O'Hare, Oakbrook Commons and Wind Creek Projects) using the same or highly similar contract/specification requirements (and also contrary to what Schneider and Thornton Tomasetti claimed in the Defamatory Memorandum). These improper actions and requirements of Thornton Tomasetti (including those of Scott Schneider) significantly impacted Plaintiffs' actual productivity on the Project, resulting in the millions of dollars in losses that were

23

ultimately sought in Concrete Collective's REA of May 2023, and which have increased since.

88.     The original May 2023 REA consisted of a 21-page narrative, accompanied by 49 pages of exhibits, which included cost backup, detailed analyses supporting causation, and other documentation demonstrating the causal link between highly complex changed conditions and Concrete Collective's lost labor productivity and other damages.  Concrete Collective thereafter submitted various supplemental/updated claims in support of its original REA, which along with the original REA claims, were still pending consideration by the Obama Foundation and Lakeside as of the dates that the Defamatory Memorandum was created by Defendants Schneider and Thornton Tomasetti.  (Hereinafter, unless specifically indicated otherwise, "REA" shall include not only Concrete Collective's original REA claims of May 2023, but also all supplemental/updated REA claims made and submitted by Concrete Collective thereafter). Concrete Collective's REA was submitted in accordance with the Concrete Collective Subcontract, which permits Concrete Collective to assert a claim for actual damages, including delay damages.

89.     The REA included a detailed analysis of Concrete Collective's schedule and cost impacts to date, including summaries of Concrete Collective's compliance with the Concrete Collective Subcontract's notice provisions and Concrete Collective's entitlement to an extension of time and increase in the Concrete Collective Subcontract GMP due to unforeseen conditions and schedule impacts. Concrete Collective's initial REA request amount was $19,838,916, which included significant concessions intended to promote a timely settlement to prevent the partner firms from self-funding future losses for the remaining 65% of the Work.

90.     The majority of Concrete Collective's compensable costs, including lost labor productivity, were caused by a multitude of contributing factors outside its control, including but not limited to, changed conditions affecting sequencing and preventing the logical flow of work,

lack of mechanical, electrical, and plumbing ("MEP") design coordination, atypical and unexpected interpretation of certain Project specifications by Thornton Tomasetti (as detailed below), extraordinary requirements for Requests for Information ("RFIs"), design errors, omissions and/or inconsistencies in the Contract Documents, inspection process delays and unforeseeable limitations in available skilled labor. Of these various contributing factors, most of these directly involved, or were related to, Thornton Tomasetti's unreasonable interpretation of certain plans and specifications relating to contact and non-contact rebar splice spacings and tolerances used on the Project, as well as the resulting, excessively rigorous and unnecessary inspection and Request For Information (RFI) processes relating thereto.

91.     After the REA was submitted, the contracting parties were able to resolve smaller, discrete items included in the REA, but the single largest cost category comprising Concrete Collective's claim (lost labor productivity) and other significant impacts (*e.g.*, time-related costs) remained unresolved as of February 5-7, 2024, continue to remain unresolved, and have only continued to increase.

92.     In the approximate two-year period since Concrete Collective submitted its initial REA, Concrete Collective's losses continued to increase, and Concrete Collective's joint venture partners (including II In One) were forced to pay for completion of Concrete Collective's Work.

93.     In total, Plaintiffs are entitled to the amount of no less than $40,753,475.00, as claimed in Concrete Collective's REA claim and Concrete Collective's recorded Mechanics Lien.

G.     **The Defendants' Response to the REA As Impacted By The Defamatory Memorandum Of February 5, 2024**

94.     Upon information and belief, based upon correspondence, emails and other documentation exchanged between Lakeside and the Obama Foundation that is presently in Plaintiffs' possession, and including but not limited to such communications and documents

referenced in this Amended Complaint, Lakeside submitted Concrete Collective's REA, in whole or in part, to the Obama Foundation as a pass-through claim.

95.     Plaintiffs are currently in possession of various emails, correspondence and other documents exchanged between the Obama Foundation and Lakeside, including but not limited to correspondence from the Obama Foundation to Lakeside dated February 7, 2024, which in turn encloses a copy of the Defamatory Memorandum authored by Schneider of Thornton Tomasetti. Upon information and belief, and based upon such emails, correspondence and other documents, Lakeside believed, prior to February 5-7, 2024, and informed the Obama Foundation, that a significant portion of Concrete Collective's REA claim which remained unpaid as of those dates was in fact valid.

96.     Lakeside, when it communicated its belief to the Obama Foundation prior to February 5-7, 2024 that a significant portion of Concrete Collective's remaining, unpaid REA claim was in fact valid, provided a copy of a Turner Engineering Group report dated December 21, 2023 (the "TEG Report") which provided support for the validity of Concrete Collective's REA claim.

97.     However, after Lakeside informed the Obama Foundation of its belief that a significant portion of Concrete Collective's remaining, unpaid REA claim was valid, including by providing a copy of the TEG Report, the Obama Foundation then requested input from Thornton Tomasetti regarding the causes of the additional costs claimed in Concrete Collective's REA claim. The Obama Foundation also forwarded a copy of the TEG Report to Thornton Tomasetti prior to the date that Schneider and Thornton Tomasetti authored the February 5, 2024 Defamatory Memorandum.

98.     In response to the Obama Foundation's foregoing, requested input, Scott Schneider

26

of Thornton Tomasetti authored the above-referenced Defamatory Memorandum dated February 5, 2024, which in turn was circulated to the Obama Foundation on or shortly after that date.

99.     The Obama Foundation in turn circulated the Defamatory Memorandum to Lakeside, on or about February 5-7, 2024.

100.    The above-referenced statements by the Defendants in their Defamatory Memorandum constitute racially-discriminatory, false and defamatory statements of fact about the II In One Entities, their performance on the OPC Project, and the experience and professional qualifications of their officers and employees, including Bob McGee.

101.    Crucially, at the time the Defamatory Memorandum was sent, the Defendants, the Obama Foundation and Lakeside each knew that the specific Project-related problems, issues and claims referenced by Schneider in the Defamatory Memorandum were more specifically within the scopes of work of W.E. O'Neil and the II In One Entities (but not Trice's direct scope of work), and that W.E. O'Neil (whom Schneider described in the Defamatory Memorandum as never having problems or issues on other projects involving the "same or substantially similar specification requirements…including a current Project utilizing the same specification which W.E. O'Neil is building not far from the OPC") was the only joint venture partner of Concrete Collective that was not majority owned by African American(s). Therefore, based upon the reasons and circumstances alleged above, the Obama Foundation and Lakeside each knew that Schneider's and Thornton Tomasetti's discriminatory and defamatory statements in the Defamatory Memorandum as to the "questionably qualified subcontractor team" was necessarily directed solely toward the II In One Entities (as African-American owned minority contractors), and not toward W.E. O'Neil (which was not minority owned).

102.    Stated differently, the clear and necessarily obvious implication of the Defendants'

statements to anyone reading the Defamatory Memorandum (including the Obama Foundation and Lakeside) was that it was the II In One Entities (African American minority owned) who were not sufficiently qualified to perform the Work, and were the true cause of the Project delays and cost overruns (rather than W.E. O'Neil, which was not minority owned).

103.    When the Defendants sent the Defamatory Memorandum, they also knew that the II In One Entities' participation in the Project included provision and training of many minority workers who had performed, and would perform, Concrete Collective's Work.

104.    When the Defendants sent the Defamatory Memorandum, they also knew that II In One was the only joint venture firm within Concrete Collective who, along with II In One Rebar, performed the rebar installation Work that gave rise to the majority of costs claimed in Concrete Collective's REA.

105.    Various portions of the work complained about by Defendants Schneider and Thornton Tomasetti in the Defamatory Memorandum, including but not limited to those under the heading "The Contractors Caused a Multitude of Problems in the Field," such as cracking in concrete slabs, were not only fully remedied and resolved by Concrete Collective prior to February 5, 2024, but were also necessarily falsely attributed to the II In One Entities' scope of work (based upon the circumstances as alleged above), when in fact such corresponding portions of the work were actually within W.E. O'Neil's (the only non-minority member of Concrete Collective) scope of work.  Regardless, W.E. O'Neil submits that the various problems contained in the Defamatory Memorandum that were within its scope of work were entirely attributable to other parties involved with the OPC Project, and who were entirely separate from the II In One Entities, W.E. O'Neil and Trice.

106.    As such, when the Defendants told the Project Owner, falsely, that "[t]he

28

construction issues were all unequivocally driven by the underperformance and inexperience of the concrete sub-contractor," the Defendants intended that the Owner interpret the Defendants' statements as indicating that the "construction issues" were solely the fault of the II In One Entities.

107. The Defendants also specifically intended and foresaw that the Obama Foundation, as Owner, would rely on the Defendants' false statements about the II In One Entities in making the decision to reject the REA.

108. The Defendants' statements about the II In One Entities' performance and lack of qualifications in the Defamatory Memorandum were not only maliciously false and contrary to the OPC Project's factual record, but were also maliciously false and contrary with respect to how the same or substantially similar specification requirements were implemented in conjunction with ACI 318 on prior and subsequent projects also involving Thornton Tomasetti, W.E. O'Neil and/or II In One, such as on the O'Hare, Oakbrook Commons and Wind Creek Projects, and were also inconsistent with findings contained within the above-referenced TEG Report which was already in Defendants' possession before the Defamatory Memorandum was drafted, published to the Obama Foundation, and republished to Lakeside.

109. Based upon and consistent with the foregoing allegations, documents, information and circumstances referenced in this Amended Complaint, the Defendants' improper, discriminatory, false and defamatory comments as contained in and ultimately published by the Defamatory Memorandum were motivated entirely by racial animus toward the II In One Entities, including Bob McGee and/or Oliver Fifer.

110. As indicated in the above-referenced Obama Foundation correspondence to Lakeside of February 7, 2024, the Foundation ultimately took the position, based upon the discriminatory, defamatory and false statements and findings of Schneider and Thornton

29

Tomasetti's Defamatory Memorandum, that the Obama Foundation would not approve Concrete Collective's REA claims that remained unpaid as of that date, in violation and in breach of the General Contract between the Obama Foundation and Lakeside, in violation and in breach of Concrete Collective's contractual rights under its Subcontract with Lakeside, in violation of Concrete Collective's rights as arising under the Illinois Mechanics Lien Act, 770 ILCS 60/1, et seq., and/or in violation of Concrete Collective's rights as otherwise provided for under controlling law.

111. After Lakeside received the above-referenced Obama Foundation correspondence dated February 7, 2024, which in turn enclosed a copy of the Defamatory Memorandum authored by Schneider of Thornton Tomasetti, Lakeside also changed its position by withdrawing any support that it previously held for the validity of remaining, unpaid REA claims of Concrete Collective, in violation and in breach of the Concrete Collective entities' rights under the Concrete Collective Subcontract and the General Contract, and in violation of Concrete Collective's rights as arising under the Illinois Mechanics Lien Act, 770 ILCS 60/1, et seq. (and whereby the Mechanics Lien Act is incorporated into all construction contracts for projects performed in the State of Illinois), and/or as otherwise arising under controlling law.

112. The Obama Foundation and Lakeside therefore ultimately did in fact rely on the Defendants' discriminatory, defamatory and false statements about II In One as contained in the Defamatory Memorandum when each of them ultimately decided to reject and withdraw further consideration of any and all remaining, previously unpaid portions of Concrete Collective's REA.

113. Shortly after February 7, 2024, Concrete Collective received correspondence from Lakeside, which enclosed the Obama Foundation's above-referenced correspondence of February

30

7, 2024 and the Thornton Tomasetti/Schneider Defamatory Memorandum.

114.    Rather than acknowledge that Concrete Collective's additional costs were primarily the result of Thornton Tomasetti's unreasonable actions and inactions described herein (factors outside Concrete Collective's control), Thornton Tomasetti and Schneider chose to unfairly single out the African-American owned minority subcontractors involved with the concrete and rebar scopes of work referenced in the Defamatory Memorandum, namely the II In One Entities, but not W.E. O'Neil (the sole contracting party involved with the concrete and rebar scopes of work on the Project that was not minority-owned), by making discriminatory, defamatory and false statements about those African-American minority owned subcontractors' "questionable qualifications," lack of relevant industry experience, performance and reputation.

115.    At the time Concrete Collective submitted its REA, Thornton Tomasetti knew or should have known that Bob McGee and the II In One Entities had extensive experience performing concrete placement and rebar installation using specifications identical and/or similar to the relevant rebar specifications for the Project.

116.    Moreover, the fact that W.E. O'Neil performed successfully on the prior Oakbrook Commons Project, and again on the subsequently-commenced Wind Creek Project with Thornton Tomasetti, and the fact that both W.E. O'Neil and II In One also performed successfully with Thornton Tomasetti on the prior O'Hare Project, without the need to submit a significant productivity claim on any of those three projects, further supports Concrete Collective's contention that the requirements imposed by Thornton Tomasetti on the Obama Presidential Center Project were overly burdensome and beyond what was reasonably anticipated when Concrete Collective submitted its bid.

117.    Upon information and belief, based upon the various events, circumstances,

documentation and information as referenced elsewhere in the allegations of this Amended Complaint, Thornton Tomasetti had actual or constructive knowledge that II In One and/or W.E. O'Neil had successfully completed similar work on projects using the same or similar rebar specifications prior to Concrete Collective's participation in the Obama Presidential Center Project.

118. Thornton Tomasetti has worked on other projects involving the same or similar specifications that are at the heart of the REA—projects in which either both II In One and W.E. O'Neil properly performed concrete work in accordance with the required specifications which were the same or substantially similar to those employed on the OPC Project, and which were implemented by II In One and W.E. O'Neil in the same fashion on those other projects as on the OPC Project. However, on those projects, Thornton Tomasetti did not attempt to enforce a non-standard and unreasonably burdensome interpretation of the subject specifications, as it did on the Obama Presidential Center Project.

119. As stated, each of Concrete Collective's partner firms (including II In One) brought significant and crucial experience and value to the Project, which enabled Concrete Collective to achieve—and even exceed—the technical and workforce goals for the Project.

120. Despite having actual or constructive knowledge that II In One had requisite skills and experience to provide valuable and necessary contributions to the Project, the Defendants issued the Defamatory Memorandum to the Obama Foundation that singled out and discriminated against the II In One Entities on the basis of race, and falsely indicated that the II In One Entities' alleged lack of sufficient qualifications and experience was the sole or primary cause of the unexpected cost increases incurred by Concrete Collective in completing its Work.

**H.** **The Financial and Reputational Harm Caused by the Defendants' Actions**

121. As a result of Thornton Tomasetti's and Schneider's Defamatory Memorandum and

32

the Obama Foundation's and Lakeside's reliance on the Defendants' discriminatory and defamatory statements and resulting denial of Concrete Collective's REA, the II In One Entities have suffered significant financial hardships, including, without limitation, the following:

      a.     The II In One Entities lost millions of dollars on the Project and, as a result, has been unable to obtain surety credit necessary to bid on bonded projects;

      b.     The II In One Entities were forced to fully draw down their bank line(s) of credit and now have a significantly reduced line of credit;

      c.     Because the II In One Entities' co-owner, Bob McGee, has personally guaranteed their line(s) of credit, he will face severe financial hardship and may be forced to personally seek relief, including but not limited to closing either or both the II In One Entities;

      d.     Concrete Collective may soon be forced to make a capital call requiring II In One to provide millions of dollars, which would result in II In One defaulting on the terms of Concrete Collective's joint venture agreement.

122.    As a result of Thornton Tomasetti's and Schneider's Defamatory Memorandum and the Obama Foundation and Lakeside's reliance on the Defendants' discriminatory and defamatory statements and resulting denial of Concrete Collective's REA, the remaining members of Concrete Collective, namely W.E. O'Neil and Trice, like the II In One Entities, have also suffered significant financial hardships, including reputational harm and loss of income of at least $40,753,475.00, and other damages, as otherwise alleged in this instant Amended Complaint.

123.    In addition to the financial harm suffered by the Plaintiffs, the inability of the II In One Entities to bid on bonded projects (including public projects) has resulted, and will result, in

fewer minority-owned, local contractors being available to bid on many Chicago-area projects.

## COUNT I
### Race Discrimination in Violation of 42 U.S.C. § 1981

124.     Plaintiffs repeat, reallege and incorporate the allegations of Paragraphs 1 through 123 of this Complaint as if fully set forth as paragraph 124 of this Count I.

125.     Bob McGee and Oliver Fifer are members of a racial minority and the co-owners of II In One and II In One Rebar.

126.     As such, the racial identity of Bob McGee and Oliver Fifer is imputed to II In One and II In One Rebar.

127.     Bob McGee, II In One and II In One Rebar have standing to bring this claim against Defendants pursuant to Section 1981, as do W.E. O'Neil and Trice, by virtue of being the remaining members of the same Concrete Collective joint venture with II In One.

128.     42 U.S.C. § 1981 guarantees that all persons shall have the right to make and enforce contracts free from all forms of discrimination on the basis of race and national origin.

129.     The Defendants, and each of them, sent the Defamatory Memorandum with the intent to discriminate against Bob McGee and the II In One Entities on the basis of race.

130.     The discrimination alleged herein interfered with the rights of Bob McGee, II In One and II In One Rebar, and also by extension, W.E. O'Neil and Trice as the remaining members of the Concrete Collective, to make and enforce contracts, including without limitation, the General Contract, the Concrete Collective Subcontract and/or the II In One JV Subcontract, and also their rights to the full and equal benefits of all laws and proceedings for the security of persons and property, including but not limited to their rights as provided for under the Illinois Mechanics Lien Act and/or as otherwise provided for under controlling law.

131.     As a result of, and but for the Defendants' above-referenced false and racially-

34

discriminatory statements and conduct in violation of Section 1981, including the racially-discriminatory and defamatory statements contained in the Defamatory Memorandum, the Obama Foundation and Lakeside Alliance would not have rejected and/or withdrawn their consideration of and/or support for the remaining, unpaid portions of Concrete Collective's REA.

132.    Following the aforementioned publication of the Defamatory Memorandum to the Obama Foundation, and its republication to Lakeside, Bob McGee and the II In One Entities have suffered reputational and financial harm, including the resulting denial of the Concrete Collective's REA claim, lost revenue and profits that they, and by extension, the remaining Concrete Collective members W.E. O'Neil and Trice, were entitled to receive as a result of their performance of Work on the Project. Bob McGee and the II In One Entities have also lost revenue and profits due to II In One's inability to obtain surety credit necessary to bid on other bonded projects, including public projects.

133.    Accordingly, the Defendants, and each of them, have violated Bob McGee's and the II In One Entities' rights as protected by 42 U.S.C. § 1981, and also by extension, have also violated the contractual and/or other legal rights of W.E. O'Neil and Trice as the remaining members of the Concrete Collective.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs Robert J. McGee, Jr., II In One Contractors, Inc., II In One Rebar, Inc., W.E. O'Neil Construction Co., and Trice Construction Company , pray this Honorable Court enter an Order in their favor providing as follows:

(a)    Entering judgment in favor of Concrete Collective, II In One and II In One Rebar, and against Defendants;

(b)     Awarding Concrete Collective, II In One and II In One Rebar compensatory damages in an amount to be proven at trial sufficient to redress the harms that they have suffered, including reputational harm and actual monetary damages of at least $40,753,475.00;

(c)     Awarding Concrete Collective, II In One and II In One Rebar, appropriate punitive damages in an amount to be proven at trial that would punish Defendants for their knowing, intentional, willful, and reckless disregard of clearly established federal statutory rights as alleged herein and enter any and all injunctive decrees and relief necessary to effectively prevent Defendants from engaging in similar unlawful racial discrimination in the future;

(d)     Awarding Concrete Collective, II In One and II In One Rebar reasonable attorneys fees and costs of this action; and

(e)     Granting all such other and further relief this Court deems equitable and just.

## COUNT II
## Libel *Per Se*

134.    Plaintiffs repeat, reallege and incorporate the allegations of Paragraphs 1 through 123 of this Complaint as if fully set forth as Paragraph 134 of this Count II.

135.    The Defendants, and each of them, made discriminatory and false statements in the Defamatory Memorandum that were either intentionally made, and/or made with a reckless disregard for their truth, as directed to McGee and the II In One Entities, and by extension, to W.E. O'Neil and Trice as the remaining members of Concrete Collective.

136.    The Defendants' intentionally and/or recklessly made false statements about the Plaintiffs were published and/or republished to third parties, including, but not necessarily limited to, the Obama Foundation and to Lakeside.

137.    The Defendants' maliciously, intentionally and/or recklessly made false statements about Plaintiffs including false statements indicating that the Plaintiffs lacked sufficient

36

qualifications, as well as a lack of experience and underperformance on the OPC Project, and hence a lack of sufficient abilities in their trade, profession or business, and/or were unable to perform and/or lacked integrity in the discharge of their duties of office or employment, whether as relating to the Concrete Collective Subcontract and the related General Contract on the OPC Project, and/or generally.

138.    The Defendants, and each of them, knew or should have known that their statements about the Plaintiffs in the Defamatory Memorandum were intentionally and/or recklessly false, that Defendants lacked reasonable grounds to believe that such statements were true and/or were necessary to include in the Defamatory Memorandum, and that such statements were otherwise not made in good faith.

139.    As a result of, and but for the Defendants' foregoing false and defamatory statements and conduct, including the racially-discriminatory and defamatory statements contained in the Defamatory Memorandum, the Obama Foundation and Lakeside Alliance would not have rejected and/or withdrawn their consideration of and/or support for the remaining, unpaid portions of Concrete Collective's REA following the aforementioned publication of the Defamatory Memorandum to the Obama Foundation, and its republication to Lakeside, and Bob McGee and the II In One Entities, and also by extension the remaining Concrete Collective members W.E. O'Neil and Trice, have suffered reputational and financial harm, including the resulting denial of the Concrete Collective's REA claim and lost revenue and profits that they were entitled to receive as a result of their performance of Work on the Project. Bob McGee and the II In One Entities have also lost revenue and profits due to II In One's inability to obtain surety credit necessary to bid on other bonded projects, including public projects.

140.    The Plaintiffs were damaged as a result of the Defendants' aforementioned false

and defamatory statements.

141.    The damages suffered by the Plaintiffs as a result of the Defendants' false and defamatory statements include, but are not limited to, reputational harm, lost revenue and profits that Plaintiffs were entitled to receive as a result of their performance of Work on the Project in a sum of no less than $40,753,475.00, and as included in their REA claim, as well as lost revenue and profits due to the II In One Entities' inability to obtain surety credit necessary to bid on bonded projects, including public projects.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Robert J. McGee, Jr., II In One Contractors, Inc., II In One Rebar, Inc., W.E. O'Neil Construction Co., and Trice Construction Company, pray this Honorable Court enter an Order in their favor providing as follows:

(a)    Entering judgment in favor of Plaintiffs and against Defendants;

(b)    Awarding Plaintiffs compensatory damages in an amount to be proven at trial sufficient to redress the harms that they have suffered, including actual monetary damages of at least $40,753,475.00;

(c)    Awarding Plaintiffs appropriate punitive damages in an amount to be proven at trial that would punish Defendants for their knowing, intentional, willful, publication of false statements about the Plaintiffs, and including any and all reasonably foreseeable republications;

(d)    Awarding Plaintiffs reasonable attorneys fees and costs of this action; and

(e)    Granting all such other and further relief this Court deems equitable and just.

## COUNT III
### Libel *Per Quod*
### (In the Alternative to Count II)

142.    Plaintiffs repeat, reallege and incorporate the allegations of Paragraphs 1 through 141 of this Complaint as if fully set forth as Paragraph 142 of this Count III.

143.    Although Plaintiffs claim that Defendants' foregoing, false and defamatory statements constitute libel per se, Plaintiffs alternatively claim that Defendants' foregoing, false and defamatory statements constitute libel per quod.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Robert J. McGee, Jr., II In One Contractors, Inc., II In One Rebar, Inc., W.E. O'Neil Construction Co., and Trice Construction Company, pray this Honorable Court enter an Order in their favor providing as follows:

(a)    Entering judgment in favor of Plaintiffs and against Defendants;

(b)    Awarding Plaintiffs compensatory damages in an amount to be proven at trial sufficient to redress the harms that they have suffered, including special, actual monetary damages of at least $40,753,475.00;

(c)    Awarding Plaintiffs appropriate punitive damages in an amount to be proven at trial that would punish Defendants for their knowing, intentional, willful, publication of false statements about the Plaintiffs, and including any and all reasonably foreseeable republications;

(d)    Awarding Plaintiffs reasonable attorneys fees and costs of this action; and

(e)    Granting all such other and further relief this Court deems equitable and just.

## COUNT IV
### Tortious Interference with Contract

144.    Concrete Collective, II In One and II In One Rebar repeat, reallege and incorporate the allegations of Paragraphs 1 through 123 of this Complaint as if fully set forth as paragraph 144 of this Count III.

145.    A valid and enforceable contract exists between Concrete Collective and Lakeside, namely the Concrete Collective Subcontract, which in turn incorporates various provisions of the

valid and enforceable General Contract between Lakeside and the Obama Foundation by reference.

146.    A valid and enforceable contract also exists between II In One and the other joint venture partners that form the Concrete Collective Joint Venture.

147.    A separate valid and enforceable contract also exists between II In One JV and Concrete Collective, namely the II In One JV Subcontract.

148.    The Defendants, and each of them, knew or should have known about each of the aforementioned interrelated valid and enforceable contracts, as pertaining to the OPC Project.

149.    The Defendants, and each of them, intentionally and unjustifiably induced, through their above-referenced wrongful discriminatory and defamatory conduct and statements, breaches of the above-mentioned General Contract and also the Concrete Collective Subcontract by both the Obama Foundation and Lakeside, by one or more of the following actions, which in turn impacted all of the Plaintiffs' interrelated rights as arising under the foregoing, interrelated contracts, as arising under the Illinois Mechanics Lien Act, 770 ILCS 60/1 et seq. (which as a matter of law is incorporated into all contracts for construction projects performed in the State of Illinois), and/or as otherwise arising under controlling law:

(a)    attempting to enforce a non-standard and unreasonably burdensome interpretation of the specifications applicable to Concrete Collective's Work; and

(b)    making racially-motivated, false and defamatory statements about McGee, the II In One Entities, and by extension, W.E. O'Neil and Trice as the remaining members of Concrete Collective, as alleged herein; and

(c)    unlawfully discriminating against McGee, and the II In One Entities on the basis of race as alleged herein, and by extension, against W.E. O'Neil and Trice as the remaining

members of Concrete Collective.

150.    As a result of the Defendants' discriminatory, defamatory and wrongful conduct and statements as described herein, Lakeside and the Obama Foundation each separately and collectively breached their foregoing contractual, statutory and/or other legal obligations to the II In One Entities, and by extension, W.E. O'Neil and Trice, by failing to give proper consideration to the above-referenced REA claim, and to pay for the labor, materials and services that were provided to the Project by Plaintiffs, including the costs claimed in the REA and Concrete Collective's Mechanics' Lien.

151.    The Defendants' interference with the above-described contracts was willful, malicious, and without just cause or right.

152.    The Plaintiffs suffered damages as a result of the Defendants' aforementioned tortious interference with the above referenced contractual, statutory and/or other legal rights, including lost revenue and profits that Plaintiffs were entitled to receive as a result of their performance of Work on the Project and lost revenue and profits due to the II In One Entities' inability to obtain surety credit necessary to bid on bonded projects, including public projects.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Robert J. McGee, Jr., II In One Contractors, Inc., II In One Rebar, Inc., W.E. O'Neil Construction Co., and Trice Construction Company, pray this Honorable Court enter an Order in their favor providing as follows:

(a)    Entering judgment in favor of Concrete Collective, II In One and II In One Rebar, and against Defendants;

(b)     Awarding Plaintiffs compensatory damages in an amount to be proven at trial sufficient to redress the harms that they have suffered, including actual monetary damages of at least $40,753,475.00;

(c)     Awarding Plaintiffs appropriate punitive damages in an amount to be proven at trial that would punish Defendants for their knowing, intentional, willful, and malicious interference with Plaintiffs' contracts;

(d)     Awarding Plaintiffs reasonable attorneys fees and costs of this action; and

(e)     Granting all such other and further relief this Court deems equitable and just.

**COUNT V**
**Tortious Interference with Business Relationships**

153.    Plaintiffs repeat, reallege and incorporate the allegations of Paragraphs 1 through 123 of this Complaint as if fully set forth as Paragraph 153 of this Count IV.

154.    At the time of the Defendants' wrongful acts alleged herein, Plaintiffs, by virtue of their involvement and work on the OPC Project, and by demonstrating their qualifications, experience and capabilities on the OPC Project, had a reasonable expectation of entering into separate and additional new valid business relationships and contracts with, and/or extended or continuing valid business relationships with same parties involved with the OPC Project, including without limitation, The Obama Foundation and Lakeside (including but not limited to the companies comprising Lakeside, namely Turner Construction Company, Powers & Sons Construction Company, UJAMAA Construction Inc., Brown and Momen, Inc., and Safeway Construction Company), and potentially other project owners and contractors in the Chicagoland area. Each of the Plaintiffs expected to receive an economic benefit as a result of the foregoing, future opportunities to form new, extended and/or continued valid business relationships with one

or more of the foregoing parties.

155.    The Defendants, and each of them, were aware of the foregoing business relationships and Plaintiffs' foregoing, reasonable expectations.

156.    The Defendants, and each of them, intentionally and without justification interfered with Plaintiffs' foregoing expected new, extended and/or continued business relationships by taking one or more of the following actions:

(a)      attempting to enforce a non-standard and unreasonably burdensome interpretation of the specifications applicable to Plaintiffs' Work on the OPC Project; and

(b)      making discriminatory, false and defamatory statements about McGee, II In One and II In One Rebar, and by extension, W.E. O'Neil and Trice as the remaining members of Concrete Collective, as alleged herein; and

(c)      unlawfully discriminating against McGee and the II In One Entities, on the basis of race as alleged herein.

157.    The Defendants' interference prevented the Plaintiffs' legitimate expectancy of new, extended and/or continued business relationships from ripening into valid business relationships and concomitant expected economic benefits to Plaintiffs.

158.    The Defendants' interference with the Plaintiffs' legitimate expectancy of new, extended and/or continued business relationships was willful, malicious, and without just cause or right.

159.    The Plaintiffs suffered damages as a result of the Defendants' intentional and unjustified interference with the Plaintiffs' above expectancies, including lost revenue and profits that Plaintiffs otherwise expected to receive, and lost profits due to II In One's inability to maintain existing and/or obtain new surety credit necessary to bid on bonded projects, including public

projects.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Robert J. McGee, Jr., II In One Contractors, Inc., II In One Rebar, Inc., W.E. O'Neil Construction Co., and Trice Construction Company, pray this Honorable Court enter an Order in their favor providing as follows:

(a)     Entering judgment in favor of Plaintiffs and against Defendants;

(b)     Awarding Plaintiffs compensatory damages in an amount to be proven at trial sufficient to redress the foregoing harms that they have suffered;

(c)     Awarding Plaintiffs appropriate punitive damages in an amount to be proven at trial that would punish Defendants for their knowing, intentional, willful, and malicious interference with Plaintiffs' business relationships;

(d)     Awarding Plaintiffs reasonable attorneys fees and costs of this action; and

(e)     Granting all such other and further relief this Court deems equitable and just.

## <u>JURY DEMAND</u>

Plaintiffs request trial by jury.

**Dated: April 1, 2025**

**Robert J. McGee Jr., II In One Contractors, Inc., II In One Rebar Inc., W.E. O'Neil Construction Co. and Trice Construction Company**

By: */s/Frank J. Marsico*_____
            One of Their Attorneys

Kathleen O. Barnes
John E. Sebastian
Frank J. Marsico
Watt, Tieder, Hoffar & Fitzgerald, L.L.P.
10 S. Wacker Drive, Suite 1100
Chicago, IL 60606-7411
(312) 219-6900
kbarnes@watttieder.com
jsebastian@watttieder.com
fmarsico@watttieder.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 1, 2025, a copy of the foregoing Amended Complaint was filed electronically with the U.S. District Court. Notice of this filing will be sent to all parties of record through the Court's Electronic Filing System. Parties may access this filing through the Court's system.

<u>/s/ *Frank J. Marsico*</u>